**Rebecca GAMBILL, Plaintiff-Appellant,**

v.

**Otis R. BOWEN, Secretary of Health and Human Services, Defendant-Appellee.**

No. 86–3804.

United States Court of Appeals, Sixth Circuit.

Argued May 5, 1987.

Decided July 24, 1987.

Jonathan A. Horwitz, argued, Hochman & Horwitz Co., LPA, Dayton, Ohio, for plaintiff-appellant.

Joseph E. Kane, Asst. U.S. Atty., Columbus, Ohio, Nicholas J. Pantel, Asst. U.S. Atty., Cincinnati, Ohio, Leonard Saphire-

Bernstein, argued, Asst. Regional Counsel, Office of the Chief Counsel, Region V, Dept. of HHS, Chicago, Ill., for defendant-appellee.

Before LIVELY, Chief Judge; ENGEL and KRUPANSKY, Circuit Judges.

LIVELY, Chief Judge.

This is a social security disability case in which benefits were denied on the basis of a misapplication of controlling regulations. We reverse and remand for an award of benefits.

## I.

### A.

Rebecca Gambill, a widow with one dependent, was 33 years old when she filed a claim for social security disability benefits in 1981. Her insured status had ended on March 31, 1977. She alleged that she had been unable to work since May 5, 1972 because of a progressive muscle disease and had not been employed since that date.

After her claim was denied initially, plaintiff requested a hearing, which was held before an administrative law judge (ALJ) on October 5, 1982. Plaintiff testified without the benefit of counsel, and presented one medical exhibit relating to the period when she was covered for disability. This was the report of Dr. Lenora Gray, a specialist in neurology, who became Ms. Gambill's treating physician. In her report Dr. Gray stated:

> Her gait revealed bilateral foot drop, moderate, with knee locking, but tandem gait was stable.... There was marked weakness of the foot, dorsi and plantar flexor, slight hammer toes on the right, moderate weakness of the quadriceps, and atrophy of the muscles of the lower legs, bilaterally. There was no atrophy of the upper extremities and no weakness.

Dr. Gray diagnosed "Charcot-Marie-Tooth disease,[1] (peroneal atrophy)" and recom-

mended admission to a hospital for further work up.

In addition plaintiff presented a report from the Diagnostic Clinic of Houston dated July 25, 1979, prepared by Dr. Ernesto Infante, who is also a neurologist. Dr. Infante had examined plaintiff and concluded that because of the slow progression of the disorder and the distribution of weakness and atrophy, her condition was more suggestive of a muscular dystrophy than a neuropathy such as Charcot-Marie-Tooth disease. The exhibit containing Dr. Infante's report also included his letter to Dr. Gray explaining the basis of his conclusions in technical terms.

Plaintiff testified that her last job required her to stand throughout her shift, and by the time she quit in May 1972, her legs "were already hurting like I'd been on 'em all day ... just to the point where I couldn't stand it anymore" after just two hours. Plaintiff suffered two falls in the winter of 1980–81, injuring her right knee and leg.

The ALJ concluded that the evidence established that plaintiff's conditions "are not attended by clinical and laboratory findings that meet or equal in severity and duration the requirements of Appendix 1 to Regulations No. 4." Having made this determination, the ALJ then investigated the question of plaintiff's residual functional capacity. Primarily on the basis of the fact that her upper extremities were unimpaired and plaintiff's opinion that she could sit indefinitely, the ALJ concluded that Ms. Gambill retained the capacity to engage in sedentary work. Then, considering her age, education and past work experience, he found that "Rule 201.27 in Appendix 2 Regulations No. 4 [the "grid"] applies and directs the conclusion that she has not been 'disabled' for any continuous 12–month period."

The Appeals Council denied plaintiff's request for review and the ALJ's decision became the final decision of the Secretary. Plaintiff sought review in the district court and the case was referred to a magistrate, who recommended a remand. The magis-

---

**1.** Charcot-Marie-Tooth disease is defined as a    progressive neuropathic muscle atrophy.

trate found that the Secretary's application of the grid was improper because there had been no showing that plaintiff could perform a full range of sedentary work. Noting that plaintiff had not been represented by counsel at the hearing, the magistrate concluded that the ALJ had failed to develop the record, particularly with respect to whether plaintiff suffered any impairment of her upper extremities. The district court adopted the magistrate's recommendation and ordered the case remanded.

### B.

A second hearing, at which plaintiff was represented by counsel, was held before a different ALJ. Plaintiff filed an updated report from Dr. Gray, which qualified her previous report. In her updated letter Dr. Gray stated that as of February 1977 plaintiff—

> did have significant and persistent disorganization of motor function in both of the lower extremities, which resulted in a sustained disturbance of gross movements and a significant gait disturbance.... Her gait was very abnormal with bilateral foot drop, inability to walk on her heels and toes, weakness of the quadricep muscles with knee locking, ... marked weakness of the foot dorsi and plantar flexor muscles, and bilateral atrophy of the muscles of the lower legs. The fact that the tandem gait was stable means that there was no cerebellar disease and no balance problem, but the gait itself was very abnormal because of her motor dysfunction.

Plaintiff testified at the hearing, and the ALJ called a vocational expert who identified three sedentary level unskilled jobs whose duties he felt plaintiff could be expected to perform. The second ALJ also found that plaintiff was not disabled within the meaning of the Social Security Act, using the grid as a "framework." This conclusion was reached despite the fact that the ALJ made the following findings:

> There is ample evidence that the claimant had severe muscular dystrophy in her legs on and prior to March 31, 1977, the date she was last insured for disability insurance benefits.... It is clear that the claimant's weight-bearing capability was substantially impaired by that time.... However, ... I must conclude that there is insufficient evidence that the claimant had any severe impairment of her upper extremities on or before the date she was last insured for disability insurance benefits.
>
> I agree that the claimant has had very pronounced problems with a bilateral foot drop with muscle weakness and atrophy in the lower extremities.... Still, I do not feel that the clinical findings have been as pronounced as required by the Listings criteria.

In seeking review of the ALJ's decision by the Appeals Council, plaintiff's attorney argued that the ALJ had misinterpreted the regulations by adding a requirement to the listing of impairments applicable to muscular dystrophy. The Appeals Council denied review and plaintiff returned to district court, where her case was referred to a different magistrate. This magistrate agreed with the ALJ's analysis of the evidence and his conclusion that while plaintiff had severe muscular dystrophy of the legs before March 31, 1977, she retained the residual functional capacity to perform sedentary work "except for sustained standing and walking, lifting and carrying more than 10 to 12 pounds, using leg controls, and duties around ladders or heights." The district court adopted the magistrate's recommendation and entered judgment for the Secretary.

### II.

### A.

The regulations provide that when a claimant can show an impairment that meets the duration requirement (12 months) and is listed in Appendix 1 (the "listings"), or is equal to a listed impairment, the ALJ must find the claimant disabled, and should not go on to consider claimant's age, education and work experience. 20 C.F.R. § 404.1520(d) (1986). The listing of impairments for neurological disorders is found in section 11 of Appendix 1,

20 C.F.R. Part 404, Subpart P. The provisions relating to muscular dystrophy are in §§ 11.13, 11.04B and 11.00C.

It is important to understand what the listings are and how they are to be used. Both questions are answered in the clear language of 20 C.F.R. § 404.1525:

(a) *Purpose of the Listing of Impairments.* The Listing of Impairments describes, for each of the major body systems, impairments which are considered severe enough to prevent a person from doing any gainful activity. Most of the listed impairments are permanent or expected to result in death, or a specific statement of duration is made. For all others, the evidence must show that the impairment has lasted or is expected to last for a continuous period of at least 12 months.

\*  \*  \*  \*  \*  \*

(c) *How to use the Listing of Impairments.* Each section of the Listing of Impairments has a general introduction containing definitions of key concepts used in that section. Certain specific medical findings, some of which are required in establishing a diagnosis or in confirming the existence of an impairment for the purpose of this Listing, are also given in the narrative introduction. If the medical findings needed to support a diagnosis are not given in the introduction or elsewhere in the listing, the diagnosis must still be established on the basis of medically acceptable clinical and laboratory diagnostic techniques. Following the introduction in each section, the required level of severity of impairment is shown under "Category of Impairments" by one or more sets of medical findings. The medical findings consist of symptoms, signs, and laboratory findings.

(d) *Diagnosis of impairments.* We will not consider your impairment to be one listed in Appendix 1 solely because it has the diagnosis of a listed impairment. It must also have the findings shown in the Listing of that impairment.

**B.**

Both ALJs concluded that plaintiff's condition did not satisfy the listing of neurological impairments and went on to consult Appendix 2, 20 C.F.R. Part 404, Subpart P. The grid lists medical vocational guidelines for sedentary, light and medium work in three tables. By use of the proper table, the residual functional capacity of a claimant can be determined by reference to age, education and previous work experience. However, as 20 C.F.R. § 404.1520(d) makes clear, these factors, and thus the grid, have no application to a claimant who satisfies one or more of the listings in Appendix 1. We agree with plaintiff that it was error for the administrative law judges to consider the grid in this case.

The three sections of the listings relevant to this case provide as follows:

11.13 *Muscular Dystrophy* with disorganization of motor function as described in 11.04B.

11.04B Significant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station (see 11.00C).

11.00C *Persistent disorganization of motor function* in the form of paresis or paralysis, ataxia and sensory disturbances (any or all of which may be due to cerebral cerebellar, brain stem, spinal cord, or peripheral nerve dysfunction) which occur singly or in various combination, frequently provides the sole or partial basis for decision in cases of neurological impairment. The assessment of impairment depends on the degree of interference with locomotion and/or interference with the use of fingers, hands, and arms.

The Secretary relies heavily on § 11.00C as providing substantial evidence in support of the ALJs' decisions. However, § 11.00C is part of the introductory section on neurological disorders, not a part of the listings. Unlike § 11.04B, § 11.00C is not specifically incorporated into the muscular dystrophy listing. Instead, it is mentioned only parenthetically, and does not appear to do more than elaborate on the possible

manifestations of "persistent disorganization of motor function," the term used in § 11.04B to establish the level of severity required for a finding of disability.

Plaintiff argues that she has suffered from an impairment since February 1977 that satisfies § 11.13 of the listings, "Muscular Dystrophy with disorganization of motor function as described in 11.04B." This is clear from the second ALJ's finding that Ms. Gambill suffered from a "significant and persistent" disorganization of motor function in two extremities, that is, in both legs. Since the listing requires, by reference to § 11.04B, only that the impairment affect two extremities, the ALJ erred in finding plaintiff not disabled because there was no significant impairment of the upper extremities, her arms. In effect the ALJ required plaintiff to demonstrate the required degree of impairment in four extremities while the listing clearly refers to two extremities. In defense of the ALJ, it must be noted that the remand order after the first appeal to district court, directed further development of the record with respect to the upper extremities. This direction was apparently based on the assumption that plaintiff had not met the listings with respect to her legs. However, once the ALJ made the finding previously quoted with respect to plaintiff's legs, it was error to consider her upper extremities.

In addition to erroneously disqualifying plaintiff because she had no impairment of her arms, the second ALJ imposed a severity requirement not contained in the listings. The ALJ specifically found that as of March 1977 plaintiff had "severe" muscular dystrophy in both legs and that her weight-bearing capability was "substantially impaired." He also found that Ms. Gambill had "very pronounced problems with a bilateral foot drop with muscle weakness and atrophy in her lower extremities." These findings clearly satisfy the requirements of § 11.13 as described in § 11.04B. Even if the questionable application of § 11.00C is permitted, Dr. Gray's updated report showed that there was a significant degree of interference with loco-

motion as of February 1977, thus satisfying this standard. This error was similar to that which led to reversal of a denial of benefits in *Graham v. Bowen*, 786 F.2d 1113 (11th Cir.1986).

### C.

The district court reasoned that Dr. Gray's reference in her first report to a "stable" tandem gait provided support for the second ALJ's conclusion that Ms. Gambill did not meet the severity requirement of the listings. In making this determination the court found that Dr. Gray's second report could be discounted because it was prepared after plaintiff's insured status had expired. This was error. Dr. Gray's second report did not conflict with the earlier one. In addition to evaluating Ms. Gambill's condition in 1985 and providing greater detail of the 1977 observations, the later report clarified a statement in the earlier one. It pointed out that the reference to a stable tandem gait in the 1977 report indicated that there was no disease of the brain affecting plaintiff's balance; it did not modify in any way the earlier finding of a very abnormal gait caused by motor dysfunction.

There was no conflict in the medical proof in this case. Dr. Gray readily agreed with Dr. Infante's diagnosis of muscular dystrophy, and the second ALJ found that plaintiff had "severe muscular dystrophy in her legs" prior to the cutoff date. By imposing requirements not found in the listings, the Secretary denied plaintiff the automatic finding of disability mandated by the regulations and then relied upon the grid to support a finding of no disability. On the whole record we are convinced that the order of the district court affirming the decision of the Secretary is not supported by substantial evidence.

The judgment of the district court is reversed, and the case is remanded for further remand to the Secretary with directions to enter an order granting benefits.