**Eddie W. ABBOTT, Plaintiff–Appellant,**

v.

**Louis M. SULLIVAN, M.D., Secretary of Health and Human Services, Defendant–Appellee.**

No. 89–2119.

United States Court of Appeals, Sixth Circuit.

Submitted April 12, 1990.

Decided June 8, 1990.

Mark W. Viel, Walz, Stanton & Viel, Big Rapids, Mich., for plaintiff-appellant.

Ayrie Moore, Dept. of Health and Human Services, Office of the Gen. Counsel, Region V, Chicago, Ill., Michael L. Shiparski, Asst. U.S. Atty., Grand Rapids, Mich., for defendant-appellee.

Before MERRITT, Chief Judge, and GUY and NORRIS, Circuit Judges.

RALPH B. GUY, Jr., Circuit Judge.

The claimant, Eddie W. Abbott, appeals a district court judgment affirming the final decision of the Secretary of Health and Human Services (the Secretary) denying his application for disability insurance ben-

efits, 42 U.S.C. § 401 *et seq.*, and supplemental security income, 42 U.S.C. § 1382 *et seq.* We find merit in the claimant's argument that the Secretary misapplied the Medical–Vocational Guidelines to direct a finding of "not disabled" despite the presence of a severe nonexertional impairment. In addition, the record reveals that the Secretary has improperly failed to consider Abbott's eligibility for benefits under the listing for mental retardation contained in appendix 1 of the Social Security Administration Regulations (the Regulations). 20 C.F.R. Part 404, Subpt. P, App. 1 § 12.05. Accordingly, we remand to the Secretary for reconsideration of Abbott's claims.

## I.

Abbott filed an application for disability insurance benefits (DIB) and supplemental security income (SSI) in July of 1986, alleging that he had been disabled since November 1984 due to a damaged left knee and pain in his right ankle. His applications were denied initially and again upon reconsideration. Abbott then sought a hearing before an administrative law judge (ALJ), which was held in March of 1988.

At the time of the hearing, Abbott was 35 years old and living with his wife and four children. He had formerly worked as a janitor, a night watchman, and, for a short time, as a welder, but had not performed any substantial gainful activity since November 1981. Although he had passed a high school equivalency test, Abbott claimed that he was unable to read the questions and that he had merely guessed at the answers. Abbott testified that he generally had difficulty with reading and writing, and was unable to perform even simple calculations.

At the hearing, Abbott complained of injuries to his left knee, right shoulder, and right ankle. In addition, he described a painful lower back condition consisting of a steady ache turning to sharp pain upon the application of pressure. He also related that his fingers often became swollen and painful, restricting manipulation.

The only one of the claimant's physical impairments discussed in any detail at the hearing was his knee injury. According to his testimony, Abbott damaged his left knee when he fell from a horse in 1982 and again while operating a floor buffer in 1984. He underwent surgery both times. A knee brace was prescribed after the first operation, but Abbott found it ineffective, and has since used a cane instead.

Abbott claimed that pain in his back and cramps in his legs prevented him from sitting or standing for more than 15 or 20 minutes at a time and compelled him to lie down two or three times per day. According to his testimony, Abbott could walk on a level surface for one city block at the most and could not walk on uneven ground at all.

The claimant related several attempts to work since the onset of his alleged disability. He stated that he had attempted a job unloading trucks but had been unable to perform the lifting required. He also tried work as a parts assembler, but claimed that weakness in his back prevented him from remaining at the job. When asked if he felt able to perform sedentary work, he responded that he did not, pointing out that he was unable to sit for long periods without moving or lying down due to his backache and leg cramps.

Finally, Abbott indicated that he had several times contemplated taking his own life, and related one incident in which he had attempted to kill himself by swallowing an overdose of pills.

At the conclusion of Abbott's testimony, the ALJ interviewed a vocational expert (VE). The VE testified that all of the claimant's past work had been unskilled and very heavy. Upon being instructed to assume that Abbott had the capacity for sedentary work, had a limited education with borderline literacy, and required a job with a "sit/stand option," the VE testified that the claimant could perform entry level employment involving simple routine tasks such as small parts assembly or packaging light articles. The VE estimated that 23,-000 such jobs existed in Michigan's lower peninsula.

The medical evidence before the ALJ consisted of several medical reports on the condition of the claimant's left knee, x-rays of his right shoulder and ankle, and a consultative psychological examination. Dr. Dunstan, the physician who performed the first operation on the claimant's knee in July of 1983, diagnosed "[i]nternal derangement of the left knee, medial meniscus laceration and medial femoral condyle articular damage." This diagnosis was confirmed by at least seven other doctors whose examinations of the claimant are included in the record.[1] The general consensus of these opinions was that Abbott's knee was markedly unstable and incapable of supporting his weight without the aid of a brace. An x-ray of the plaintiff's spine revealed a mild scoliosis and an inflamed back muscle. There was no medical evidence supporting any of Abbott's other claims of physical impairment.[2] Three of the seven doctors who examined Abbott expressed an opinion as to his physical capacity to work; all three indicated that the claimant would be able to perform a sedentary job with the aid of a knee brace.

Because of Abbott's attempted suicide, the Secretary referred him to Dr. Lawrence Probes for a psychological examination. Dr. Probes noted that his interview with the claimant was "difficult because of [Abbott's] psychomotor retardation, as well as his slow, pressured speech." Dr. Probes wrote that the claimant often appeared to be speaking past him, a response "typical of that seen in the passive aggressive individual." The report indicates impaired memory and concentration, and below average intelligence. Abbott was incapable of making change for a dollar, even after a concerted effort, and seemed unable to understand the concept of direction.

Dr. Probes noted symptoms of "major depression which very likely will require an antidepressant medication." He concluded his report in the following language:

> [Abbott] may well be exhibiting some mild organic brain syndrome, possibly a chronic and residual effect of alcohol and a combination of other substances abused over time. He may very well have learning disabilities which hamper him educationally. Because of his overal [sic] combination of severe character disorder and prolonged disability, I think his prognosis is quite poor.

In his final decision, the ALJ determined that Abbott's testimony regarding his pain and restriction of activity was exaggerated in relation to the medical evidence on record. He found that Abbott's combination of physical impairments prevented him from returning to his job as a janitor, but left him with the residual functional capacity to perform the unskilled sedentary employment described by the VE. After discussing the claimant's mental impairments as revealed by Dr. Probes, the ALJ noted that the psychiatric review contained no indication that Abbott had suffered from depression for more than a brief period of time. He was therefore "unable to interpret the report as indicating the claimant would have been precluded because of his depression or personality difficulties from performing full-time work for a significant period of time." Accordingly, the ALJ found that Abbott's mental impairments did not prevent him from performing the jobs suggested by the VE, and that he was therefore not disabled under the terms of the Act. The ALJ also indicated that rule 201.24, contained in the Medical–Vocational

---

1. In August of 1984, Dr. Steury examined Abbott's knee and found "early degenerative joint change." In 1985, Dr. Alger examined the knee and determined that it exhibited marked instability. Dr. Hoekzema also looked at the claimant's knee in 1985 and indicated that it required a brace. Dr. L. Swenson, an orthopedic surgeon, returned a diagnosis of internal displacement of the left knee. In July 1986, another orthopedic surgeon, Dr. T. Haverbush, noted that Abbott had instability of the left knee that might require reconstructive surgery.

Finally, on February 11, 1987, Dr. Coretti performed a consultative examination in which he indicated instability of the left knee which would require a brace for stabilization. Dr. Coretti also indicated that some surgery might be necessary.

2. An examination of Abbott's right ankle revealed no permanent damage, and the only x-ray of Abbott's right shoulder was negative.

Guidelines, 20 C.F.R. Part 404, Subpt. P, App. 2, directed such a finding.

The Appeals Council granted Abbott's request for review of the ALJ's decision because the ALJ had failed to explain that, after Abbott had demonstrated his inability to perform past employment, the Secretary bore the burden of proving that Abbott could perform a significant number of other jobs then existing in the national economy. *See* 20 C.F.R. §§ 404.1520 and 416.-920. The Appeals Council invited Abbott to submit additional evidence of disability, which he did in the form of a psychological report by Dr. Forrest Braack, Ph.D.

Dr. Braack administered an intelligence test in which he "specifically utilized the Stanford–Binet Intelligence Scale because it has been shown to be the most accurate instrument for measuring global level of intellectual functioning, especially at the middle to lower end of the intelligence range." Dr. Braack found that Abbott had attained an overall mental age of 9.3 years, resulting in a "deviation IQ (1972 Binet L–M normed tables) of 56, which places the client's intellectual skills within the mildly retarded level of intellectual functioning." In his summary, Dr. Braack found that, "[i]n general, Mr. Abbott showed relative strengths in vocabulary and verbal fluency and general comprehension. Most notable weaknesses were in memory and concentration and visual-motor ability."

The report also includes Abbott's scores on the Slosson Oral Reading Test (SORT), which indicate that he possesses the reading skills of a third grade child. Dr. Braack explained: "From the SORT it appeared that Mr. Abbott has little or no phonetic skills.... [H]is reading skills are primitive at best." Dr. Braack expressed apprehension about Abbott's visual-motor ability, noting that "[h]e had considerable difficulty with certain geometric shapes[,]" and that "[t]he visual-motor integration results are consistent with someone having a degree of brain damage." The report concludes with the following observations:

Mr. Abbott presents a difficult situation. His physical condition appears to rule out heavy physical labor. Yet his intellectual functioning is so impaired as to limit his participation in non-physical labor. Personality problems further complicate the picture making it difficult for him to get along well with others, especially these [sic] in authority positions.

Based on the record before the ALJ and Dr. Braack's report, the Appeals Council completed a psychiatric review technique form in which it indicated that Abbott suffered from severe mental impairments consisting of affective and personality disorders and mental retardation, but that none of his impairments met a listing contained in appendix 1 of the Regulations, 20 C.F.R. Part 404, Subpt. P. The Council agreed with the ALJ that Abbott's damaged knee left him with the physical capacity to perform sedentary work as defined in 20 C.F.R. §§ 404.1567 and 416.967. They then held that his mental impairments did not impose significant nonexertional limitations on Abbott's capacity to work. The Council concluded its opinion by stating that rule 201.27 contained in the Medical–Vocational Guidelines had been correctly employed "as a framework for deciding that the claimant was not disabled," and therefore that the ALJ had correctly denied benefits.

Abbott appealed this decision to the United States District Court for the Western District of Michigan. In a memorandum opinion issued March 23, 1989, the court granted the defendant's motion for summary judgment, finding that substantial evidence supported the conclusion of the Secretary. From this decision Abbott now appeals.

## II.

Pursuant to 42 U.S.C. § 405(g), we review the final decision of the Secretary for compliance with applicable legal criteria and to determine whether substantial evidence exists on the record to support each necessary finding. *Blankenship v. Bowen,* 874 F.2d 1116, 1120 (6th Cir.1989); *McCormick v. Secretary of Health and Human Services,* 861 F.2d 998, 1001 (6th Cir.1988). Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971). A finding of substantial evidence must be "based on the record as a whole" and must "take into account whatever in the record fairly detracts from its weight." *Garner v. Heckler,* 745 F.2d 383, 388 (6th Cir.1984) (quoting *Beavers v. Secretary of Health, Education and Welfare,* 577 F.2d 383, 387 (6th Cir.1978)). Where the Appeals Council has reviewed the decision of an ALJ, the determination of the Council becomes the final decision of the Secretary for purposes of our review. *Mullen v. Bowen,* 800 F.2d 535, 538 (6th Cir.1986) (en banc).

A. Determination of Disability Under the Regulations

Supplemental security income benefits and disability insurance benefits are available only to those individuals who can establish "disability" within the terms of the Social Security Act. 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A). The Act defines "disability" as the inability to engage in

any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months....

42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A). Congress delineated four factors that the Secretary must consider in determining whether the claimant is capable of performing substantial gainful activity: the individual's age, his education, his job experience, and his functional capacity to work. *See* 42 U.S.C. §§ 423(d)(2)(B) and 1382c(a)(3)(B).

The Regulations promulgated by the Secretary to administer benefit payments require that a five-step sequential process be followed in evaluating all claims of mental or physical disability. 20 C.F.R. §§ 404.-1520 and 416.920. First, the claimant must establish that he is not engaged in substantial gainful activity at the time he seeks benefits. 20 C.F.R. §§ 404.1520(b) and 416.920(b). Second, the individual must show that he has a "severe impairment"; that is, an impairment or combination of impairments which "significantly limits ... physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c) and 416.920(c); *see Farris v. Secretary of Health & Human Services,* 773 F.2d 85, 89–90 (6th Cir.1985).

A claimant who has been determined to suffer from a severe impairment proceeds to the third step of the process in which the Secretary must determine whether the medical evidence alone establishes the claimant's inability to engage in substantial gainful activity. At this stage, the claimant's impairment is matched against the specific medical disorders listed in appendix 1 of the Regulations. 20 C.F.R. Part 404, Subpt. P, App. 1. An individual who can show that he suffers from a listed impairment, or its medical equivalent, will be found disabled regardless of his age, education, or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d); *Gambill v. Bowen,* 823 F.2d 1009, 1011 (6th Cir.1987).

1. *The Appendix 1 Listings for Mental Disability*

In order to establish disability due to the presence of a mental impairment on the basis of medical evidence alone, a claimant must satisfy the requirements of one of the nine listings for mental impairment contained in appendix 1. Most of these listings impose two requirements: first, that the claimant possess certain particular signs or symptoms; and second, that the symptoms result in a specified degree of functional limitation. The symptoms are generally found in paragraph A of each listing and, hence, are referred to as the "A criteria." The "functional limitations associated with mental disorders which are incompatible with the ability to work," 20 C.F.R. Part 404, Subpt. P, App. 1 § 12.00, are generally contained in paragraph B of the listings, and are the same for all relevant disorders. The "B criteria" require, depending on the particular listing, that either two or three of the following restrictions exist in order for disability to be found at this stage:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Deficiencies of concentration, persistence or pace resulting in frequent failure to complete tasks in a timely manner (in work settings or elsewhere); or

4. Repeated episodes of deterioration or decompensation in work or work-like settings which cause the individual to withdraw from that situation or to experience exacerbation of signs and symptoms (which may include deterioration of adaptive behaviors).

20 C.F.R. Part 404, Subpt. P, App. 1 §§ 12.-02B, 12.03B, 12.04B, 12.06B, 12.07B, 12.-08B.

■ The Appeals Council determined that Abbott displayed signs and symptoms of three listed mental impairments: personality disorder, see § 12.04; affective disorder, see § 12.08; and mental retardation, see § 12.05. The Council found that Abbott did not qualify for disability benefits under the appendix 1 listings, however, because his mental impairments, in combination, did not impose the degree of functional limitation required by the B criteria. We do not dispute the Council's determination that Abbott did not meet the requirements of the B criteria, and we agree that this failure properly precluded him from qualifying for benefits under the listings for personality disorders and affective disorders. The problem we discern is the Council's apparent failure to analyze Abbott's impairment due to mental retardation in accordance with the special provisions of that particular listing.

■ The listing for mental retardation and autism, contained in appendix 1 at section 12.05, and set forth in the margin, differs from nearly all of the others in that it does not require satisfaction of the B criteria in all cases.[3] The listing allows for a finding of disability due to mental retardation where test scores below 59 on the Wechsler Adult Intelligence Scale (WAIS) are achieved, without any direct proof of functional incapacity. Where intelligence scores fall between 59 and 69 inclusive, a finding of disability on medical evidence alone requires either satisfaction of the B criteria, contained in paragraph D of the listing for mental retardation, or the presence of "a physical or other mental impairment imposing additional and significant work-related limitation of function."

It would appear that Abbott qualifies for benefits under the listings on the basis of his IQ of 56 alone. There is a complication

3. The listing for mental retardation provides as follows:

*Mental Retardation and Autism:* Mental retardation refers to a significantly subaverage general intellectual functioning with deficits in adaptive behavior initially manifested during the developmental period (before age 22). (Note: The scores specified below refer to those obtained on the WAIS, and are used only for reference purposes. Scores obtained on other standardized and individually administered tests are acceptable, but the numerical values obtained must indicate a similar level of intellectual functioning.) ....

The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

A. Mental incapacity evidenced by dependence upon others for personal needs (e.g., toileting, eating, dressing, or bathing) and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded;

OR

B. A valid verbal, performance, or full scale IQ of 59 or less;

OR

C. A valid verbal, performance, or full scale IQ of 60 to 69 inclusive and a physical or other mental impairment imposing additional and significant work-related limitation of function; OR

D. A valid verbal, performance, or full scale IQ of 60 to 69 inclusive ... with two of the following;

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Deficiencies of concentration, persistence or pace resulting in frequent failure to complete tasks in a timely manner (in work settings or elsewhere); or

4. Repeated episodes of deterioration or decompensation in work or work-like settings which cause the individual to withdraw from that situation or to experience exacerbation of signs and symptoms (which may include deterioration of adaptive behaviors).

20 C.F.R. Part 404, Subpt. P, App. 1 § 12.05.

in this case, however, due to the fact that Dr. Braack calculated the claimant's IQ according to the Stanford–Binet Intelligence Scale while the numerical values included in section 12.05 refer to results achieved on the WAIS. The listing provides that "[s]cores obtained on other standardized and individually administered tests are acceptable, but the numerical values obtained must indicate a similar level of intellectual functioning." 20 C.F.R. Part 404, Subpt. P, App. 1 § 12.05. While the Regulations do not include a table for correlating scores obtained on the Stanford–Binet Intelligence Scale with WAIS values, they do provide some guidance on the process by which scores may be compared. The introduction to the listings provides as follows:

Identical IQ scores obtained from different tests do not always reflect a similar degree of intellectual functioning. In this connection, it must be noted that on the WAIS for example, IQs of 69 and below are characteristic of approximately the lowest 2 percent of the general population. In instances where other tests are administered it would be necessary to convert the IQ to the corresponding percentile rank in the general population in order to determine the actual degree of impairment reflected by those IQ scores.

In cases where more than one IQ is customarily derived from the test administered, i.e., where verbal, performance, and full-scale IQs are provided as on the WAIS, the lowest of these is used in conjunction with listing 12.05.

20 C.F.R. Part 404, Subpt. P, App. 1 § 12.00D. Additionally, we note the existence of literature in the field of psychiatry which provides a correlation between the two scales. *See* Simmons, Tymchuk and Valente, "Treatment and Care of Mentally Retarded," 4 *Psychiatric Annals* 38, 42 (1974) (including a table correlating ranges of scores obtained on the Stanford–Binet test with Wechsler ranges) (quoted in *United States v. Masthers*, 539 F.2d 721, 724 (D.C.Cir.1976)). According to the above-referenced article, it appears that scores on the two tests are roughly equivalent, with scores on the Stanford–Binet scale never falling below equivalent scores on the WAIS by more than five points. The IQ of 56 reported by Dr. Braack, being three points below that required on the WAIS to qualify for disability on IQ alone, and 13 points below that required of a claimant, such as Abbott, who has a significant additional limitation on his ability to work, would appear to raise a substantial question as to whether Abbott could qualify as disabled at the third stage of the Secretary's sequential process.

Dr. Braack, who is certified by the Secretary to perform psychological examinations, specifically determined that the IQ of 56 on the Stanford–Binet Scale represented an accurate representation of Abbott's intellectual capacity. Nowhere in its opinion does the Appeals Council discount Dr. Braack's report or findings.[4] In fact, with the exception of the numerical IQ, the Council appears to accept Dr. Braack's findings at face value. We find, therefore, that the Appeals Council erred in failing to analyze Abbott's mental retardation under the terms of section 12.05B and C.[5]

4. While the Appeals Council's opinion includes a brief summary of Dr. Braack's conclusions in its evaluation of the evidence, nowhere does it mention the IQ score of 56. The psychiatric review technique form attached to the Council's narrative opinion indicates that Abbott did not have an IQ of 69 or less, which would have qualified him for benefits under 12.05B or C. Instead, the words "Mental Age of 9.3 years on the Stanford–Binet Intelligence Scale" are written in beside a box checked "absent."

It is also possible that the Appeals Council simply failed to take notice of the specific requirements of the listing for mental retardation. Nowhere in its opinion does the Council refer to section 12.05 or any of the unique criteria for

determining disability contained therein. The narrative decision of the Appeals Council contains no analysis whatsoever of whether Abbott's mental retardation meets the unique criteria set out in section 12.05. The sole discussion of the appendix 1 listings for mental impairments contained in the written decision is no more than a formulaic restatement of the findings regarding the B criteria in Section IV of the psychiatric technique review form.

5. Examination of the record reveals that Abbott brought a motion before the district court to remand his claim to the Secretary for submission of additional evidence. The additional evidence consisted of a psychologist's report con-

### 2. Application of the Medical–Vocational Guidelines

■ We turn now to the only argument Abbott has briefed on appeal: that the Secretary improperly applied the Medical–Vocational Guidelines. The Secretary employs the Medical–Vocational Guidelines, also referred to as the "grid," in the fifth and final stage of the disability determination, after it has been determined that the claimant has not met the requirements of a listed impairment but is nevertheless incapable of performing past relevant work. At this point, the Secretary bears the burden of demonstrating that, notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy. *Cole v. Secretary of Health & Human Services*, 820 F.2d 768, 771 (6th Cir.1987); *Richardson v. Secretary of Health & Human Services*, 735 F.2d 962, 964 (6th Cir. 1984).

■ Where the claimant suffers from an impairment limiting only his strength, the Secretary can satisfy his burden, without considering direct evidence of the availability of jobs the particular claimant can perform, through reference to the grid. The grid aids the Secretary in determining disability claims by allowing "administrative notice" to be taken of the existence of jobs in the national economy that those with particular combinations of the four statutory factors are capable of performing. *Kirk v. Secretary of Health & Human Services*, 667 F.2d 524, 529 (6th Cir. 1981), *cert. denied*, 461 U.S. 957, 103 S.Ct. 2428, 77 L.Ed.2d 1315 (1983). The grid is composed of rules, numbered 201.01 through 203.31, each of which specifies whether a claimant with a particular combination of the four factors listed in the Act, 42 U.S.C. §§ 423(d)(2)(B) and 1382c(a)(3)(B),

will be found disabled or not disabled. In finding Abbott not disabled, the Appeals Council applied rule 201.27 which states that where "[m]aximum sustained work capability [is] limited to sedentary work as a result of severe medically determinable impairment(s)," the claimant is under 50 years of age, has at least a high school education, and has experience performing only unskilled work, a finding of "not disabled" is directed.[6]

■ The Medical–Vocational Guidelines take account only of a claimant's "exertional" impairment; that is, "an impairment which manifests itself by limitations in meeting the strength requirements of jobs[.]" 20 C.F.R. Part 404, Subpt. P, App. 2 § 200.00(e). Where a claimant suffers from an impairment that significantly diminishes his capacity to work, but does not manifest itself as a limitation on strength, for example, where a claimant suffers from a mental illness, *see, e.g., Cole*, 820 F.2d at 772; manipulative restrictions, *see, e.g., Hurt v. Secretary of Health & Human Services*, 816 F.2d 1141, 1143 (6th Cir.1987); or heightened sensitivity to environmental contaminants, *see, e.g., Shelman v. Heckler*, 821 F.2d 316, 322 (6th Cir.1987), rote application of the grid is inappropriate. *Cole*, 820 F.2d at 771; *Hurt*, 816 F.2d at 1143; *Kimbrough v. Secretary of Health and Human Services*, 801 F.2d 794, 796 (6th Cir.1986). In the case of an individual who suffers from both exertional and nonexertional impairments, where the grid does not yield a finding of "disabled" when the exertional impairments are considered alone, the grid may be employed only as a "framework" to provide guidance. *See* 20 C.F.R. Part 404, Subpt. P, App. 2 § 200.00(e)(2).

The rule against application of the grid to individuals who suffer from nonexertion-

---

taining a WAIS score of 65. We do not dispute the district court's finding that this evidence was available prior to the Secretary's final decision, and hence could not be used to reopen the Secretary's final decision. *See Willis v. Secretary of Health and Human Services*, 727 F.2d 551, 554 (6th Cir.1984). The Secretary may, nevertheless, find this information useful on remand in determining whether Abbott is disabled under section 12.05.

6. We note that the Appeals Council erred in applying rule 201.27, which applies to individuals with at least a high school education. It will be recalled that Abbott reads at the third grade level and cannot make change for a dollar. The most closely applicable rule is 201.24 which applies to individuals whose education is "limited or less." As both rules direct a finding of not disabled, the error is of no consequence in this appeal.

al limitation significantly restricting the range of available work is reflected in the Secretary's regulations explaining proper application of the grid. This is the case with regard to grid rule 201.27, which was cited by the Appeals Council as authority for its determination of no disability. The rule is qualified by footnote 4, which references 20 C.F.R. Part 404, Subpt. P, App. 2 § 201.00(h). That section provides, in relevant part:

> [A] finding of disabled is *not precluded* for those individuals under age 45 who do not meet all of the criteria of a specific rule and who do not have the ability to perform a full range of sedentary work. The following examples are *illustrative:* ... Example 2: An illiterate 41 year old individual with mild mental retardation (IQ of 78) is restricted to unskilled sedentary work and cannot perform vocationally relevant past work, which had consisted of unskilled agricultural field work; his or her particular characteristics do not specifically meet any of the rules in Appendix 2, because this individual cannot perform the full range of work defined as sedentary. In light of the adverse factors which further narrow the range of sedentary work for which this individual is qualified, a finding of disabled is *appropriate.*

(Emphasis added). In this manner, section 201.00(h), in effect, codifies the rule set out in *Kirk*, 667 F.2d at 524, that the grid may not be used to "preclude" a finding of disabled where a significant nonexertional impairment exists.

In his appeal, Abbott claims that the example contained in section 200.00(h) must be read to do more than remove the claims of individuals who cannot perform the full range of sedentary work from consideration under rule 201. Abbott maintains that the example directs a finding of disabled whenever a claimant's case presents analogous facts. He argues that the ALJ's factual findings in this case are so similar to those contained in the example as to require a finding of disability.

We cannot agree with the plaintiff's expansive reading of an example intended merely to illustrate the limited applicability of the grid. The plain meaning of the text reproduced above is simply that an ALJ is "not precluded" from finding a disability for those individuals who would fit within rule 201.27 but for their inability to perform the full range of sedentary work. Section 200.00(h), as a whole, acts merely to remove the mandatory directive of the grid rule where it is not appropriate; the example is no more than an illustration of a situation in which an ALJ's decision to award benefits would be "appropriate," despite the contrary directive of the grid.

Although we do not agree that the grid directs a finding of disability, we find merit in Abbott's argument that the Appeals Council erroneously applied the grid to direct a finding of not disabled despite the presence of significant nonexertional impairments. The Appeals Council stated specifically that rule 201.27 was used to "direct" a finding of not disabled. While the word "framework" appears in their next reference to the rule, a fair reading of the record reveals that the Council relied entirely on the grid. In fact, there was no other evidence that Abbott was capable of performing substantial gainful activity existing in the national economy. The ALJ did consult a vocational expert; however, it appears that the VE was never made aware of Abbott's severe mental impairments. Under such circumstances, his testimony cannot satisfy the Secretary's burden of proof at the final stage of the disability determination.

Accordingly, if the Secretary should somehow determine upon remand that Abbott does not qualify for disability benefits on the basis of the appendix 1 listings for mental retardation, a final determination of "not disabled" may only be entered if supported by "expert vocational testimony or other similar evidence to establish that there are jobs available in the national economy for a person with the claimant's characteristics." *Tucker v. Heckler*, 776 F.2d 793, 795–96 (8th Cir.1985). If a VE is employed to satisfy this burden, he must, of course, be informed of the plaintiff's mental impairments if his opinion is to carry evidentiary weight.

The decision of the district court affirming the Secretary's denial of benefits is REVERSED and the case is REMANDED to the Secretary for disposition in accordance with this opinion.