151 F.3d 1033
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
Harold JENKINS, Plaintiff-Appellant,
v.
Kenneth S. APFEL, Commissioner of Social Security, Defendant-Appellee.
 No. 97-3812.
 United States Court of Appeals, Seventh Circuit.
 Argued May 29, 1998.
Decided June 17, 1998.
 
 Appeal from the United States District Court for the Southern District of Illinois. No. 94 C 683. Clifford J. Proud, Magistrate Judge.
 Before Hon. WALTER J. CUMMINGS, Hon. KENNETH F. RIPPLE, Hon. TERENCE T. EVANS, Circuit Judges.
 
 ORDER
 
 1
 Harold Jenkins has been persistent in his quest for disability insurance benefits (DIB), 42 U.S.C. § 401 et seq., and supplemental security income (SSI), 42 U.S.C. § 1381 et seq. He has filed five applications for benefits between 1988 and 1991. Today we consider his appeal from the denial of the fifth application.
 
 
 2
 Jenkins, now 37 years old, has only one functioning kidney. He is also borderline mentally retarded-a psychological evaluation in 1988 pegged his IQ at 72,[1] and although he graduated from high school (in special ed classes), his reading and spelling skills are at the third grade level and his math skills only a tad higher. Nevertheless, Jenkins led a normal life, working as a roofer and then as a cook, until the fall of 1988, when his left kidney, the functioning one, started giving him problems. With the onset of these problems he quit his job and filed his first application for DIB.
 
 
 3
 On January 4, 1989, soon after his filing, Jenkins had surgery on his left kidney to remove some kidney stones. The surgery, though leaving a rather large scar on his left side, was an apparent success, and on February 17, 1989, the surgeon, Dr. W.M. Bradford, released Jenkins to return to work-although he noted that the incision scar was tender. Shortly after that, the Social Security Administration (SSA) denied Jenkins' first DIB application, but Jenkins, disagreeing with both Dr. Bradford's prognosis and SSA's decision, continued to file DIB (and concurrent SSI) applications, claiming that the pain in his left side-not any problems with his kidney-was completely debilitating and made him unable to work any job that his low mental capacity qualified him for. The relevant application here is his fifth one, filed on September 28, 1991.[2]
 
 
 4
 DIB (and SSI, which Jenkins applied for later) requires that an applicant be disabled and defines such a person as one with "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The social security regulations, 20 C.F.R. § 404.1520(a)-(f)(DIB) and 20 C.F.R. § 416.920(a)-(f) (SSI), use a five-question sequential inquiry to find out if the applicant is disabled. We will use it as a framework for analysis of this case.
 
 
 5
 The first-is the applicant working?-and second-does the applicant have a severe mental or physical impairment that limits his ability to work?-questions must always be answered in the negative. In Jenkins case they were, as he had not worked since 1988 and his impairment was severe enough for SSA to concede this threshold inquiry.
 
 
 6
 From there, the next question is whether the impairment meets or medically equals the severity of any impairment listed in the social security regulations in 20 C.F.R. Part 404, Subpt. P, App. 1. If it does, the applicant is automatically found disabled. Jenkins admits that the pain in his side doesn't fit the bill. So he must show that he cannot do his past relevant work. In making this inquiry, the SSA evaluates the applicant's residual functional capacity-SSA lingo for what the applicant can still do. 20 C.F.R. § "404.1545(a)(DIB); 20 C.F.R. § 416.945(a)(SSI).
 
 
 7
 Because the SSA concedes that Jenkins can no longer work at his old job as a cook, we are left with the final question: Can he do any other jobs? More precisely, the question is whether Jenkins, in light of his residual functional capacity, can do a significant number of other jobs in the national economy. Allen v. Sullivan, 977 F.2d 385, 387 (7th Cir.1992). The SSA thought he could, and so it found Jenkins nondisabled initially and on reconsideration. Jenkins appealed this decision to an administrative law judge (ALJ).
 
 
 8
 ALJ John Bauer analyzed Jenkins' residual functional capacity. He acknowledged Jenkins' mental limitations by confining the job field to those involving "simple non-complex tasks." As far as physical limitations, at the time of the hearing (January 14, 1993) Jenkins had little medical evidence supporting any totally debilitating pain, so the issue rested on the credibility of his testimony. He testified that the pain was so bad that he could only sit for 30 minutes and stand for 20 minutes at a time, lift 1-2 pounds, and that he needed morning and afternoon naps to get through the day. However, a disability report that Jenkins filled out and signed on April 29, 1992, called his testimony into question. In the report, while explaining that he was in pain, Jenkins stated that every day he watched 8 hours of TV, walked 1/4 mile to "stay in shape," and listened to the radio for 2 hours. He also wrote that he often played cards with his buddies for an hour at a time, shopped, fixed his own food, and had his girl friend over. In resolving the credibility of Jenkins' testimony, ALJ Bauer split the baby and concluded that while Jenkins' pain was somewhat debilitating it didn't prevent him from sitting for an hour, standing for 15-30 minutes (alternating for the length of an 8-hour workday), and picking up 5 pounds.
 
 
 9
 Once residual functional capacity is determined, the SSA's medical-vocational guidelines (also known as the "grid") come into play. The grid takes administrative notice of the kinds of jobs available in the national economy. Abbott v. Sullivan, 905 F.2d 918, 926 (6th Cir.1990). It contains rules that cubbyhole applicants according to their physical and mental capacities and their vocational profile-age, education, and experience-and matches them up with the available jobs. 20 C.F.R. Part 404, Subpt. P, App. 2, § 200.00(a). Where an applicant matches up perfectly with a rule, the rule directs a finding of not disabled without any further inquiry. Id.
 
 
 10
 In Jenkins' case, 20 C.F.R. Part 404, Subpt. P, App. 2, Table 1, Rule 201.24, is the most relevant rule-it says that 18- to 44-year-old applicants who are limited to sedentary work (which requires that the applicant have the residual physical capacity to lift no more than 10 pounds and sit and stand, 20 C.F.R. §§ 404.1567(a) and 416.967(a)) and are literate are not disabled even though they have no apparent job skills. But according to ALJ Bauer, Jenkins could pick up 5 pounds, not 10. Therefore, he couldn't do the full range of sedentary jobs and he fell outside the Rule 201.24 cubbyhole.
 
 
 11
 If an applicant's capacity doesn't fall within a rule it doesn't mean that he is automatically disabled. Rather, it means that an individualized inquiry into the applicant's job prospects, using vocational resources, is required-the very inquiry that the rule would have bypassed. Peterson v. Chater, 96 F.2d 1015, 1016-17 (7th Cir.1996). ALJ Bauer did this, hearing from vocational expert William Durbin, who said that there were 4,000 to 5,000 package handler and machine tender jobs in the St. Louis area that would suit Jenkins' capabilities. These jobs, which involve monitoring an assembly line, were appropriate for Jenkins because he had the choice of standing by the line or sitting on a stool (or alternating), and they involved reaching and leaning-not among Jenkins' listed limitations-but little lifting, bending, or twisting. On the strength of Durbin's testimony, ALJ Bauer found that Jenkins was not disabled.
 
 
 12
 Jenkins appealed the decision to the Appeals Council. Meanwhile he began to actively seek a solution to his problem-or more proof of disability. In January 1993 he went to Dr. Willie Morgan, a urologist. While he didn't help Jenkins' pain medically, Dr. Morgan did fill out a form saying that Jenkins could lift only 10 pounds, stand for 1-1/2 hours out of an 8-hour day, sit no more than 2 hours straight, and that reaching, handling, pushing, and pulling items was "uncomfortable."[3] Dr. Morgan prescribed Buspar for the pain, the first prescription pain relief that Jenkins took regularly for the pain in his side.
 
 
 13
 In July of 1993 Jenkins went to see Dr. Stanley Buck, a specialist in internal medicine. Dr. Buck found tenderness and swelling in the scar area, a persistent kidney infection, and, after he took an X ray, some back problems-the collapse of the L-5/S-1 discs and some mild scoliosis. He found that while Jenkins could move all his limbs freely, he experienced pain when bending or twisting at the waist. Based on Jenkins' complaints and these findings, Dr. Buck wrote a letter saying that Jenkins was "unable to work due to his severe pain and difficult mobility."
 
 
 14
 Because Dr. Buck still had no explanation for Jenkins' pain, he referred him to Dr. Naseer, a neurologist. On September 8, 1993, Dr. Naseer examined Jenkins' left side and leg-according to Jenkins the pain started in his back, ran toward his left side and down his left leg-and gave him an electromyogram (EMG) test, which involves placing an electrode at the source of the pain to record the nerve firings given off by muscle in the area. Nerve firings when the muscle is at rest show abnormal nerve activity. When the firings occur in a surgically scarred area, it suggests neuralgia, a condition that occurs when, after a surgical incision, the cut nerves heal improperly. These nerves aren't able to process sensations properly and the result is that every touch in the afflicted area, no matter how light, creates a painful sensation. The sensation can't be eliminated, only dulled, by pain medication, and the only relief occurs when the muscle in the affected area gradually dies. Apparently the more nerve firings that show up on the EMG test the more abnormal the nerve and the more painful the sensations.
 
 
 15
 In Jenkins' case his attorney conveniently showed up with a video recorder to tape the EMG test. The tape shows that the electrode placed on his scar indicated nerve firings when the muscles near his scar were relaxed-and that, when placed elsewhere, the electrode indicated firing only when the muscles were flexed. However, Dr. Naseer rated the firings as "few" in his report (on a scale of (1) occasional, (2) few, (3) many, and (4) severe/profuse).
 
 
 16
 While not earth-shattering, this was new evidence-and the first objective medical evidence supporting Jenkins' complaints of pain-so, on November 12, 1993, the Appeals Council remanded Jenkins' case to ALJ Bauer, who held a supplemental hearing and heard Dr. Naseer's diagnosis of neuralgia, supported by the EMG test. However, Dr. Naseer also testified that Jenkins' pain would rate between a 4 and 5 on a scale of 10-which he said was a superficial level of pain-and that Jenkins could walk without too much pain. Jenkins, apparently feeling that his condition had worsened, testified that he couldn't even walk a block, stand more than 3 minutes, or reach effectively enough to pick up a carton of milk.
 
 
 17
 The new evidence didn't change ALJ Bauer's mind. In an order dated March 4, 1994, he found that Jenkins' claims of debilitating pain were still incredible and he discounted Dr. Naseer's testimony as establishing only superficial, not debilitating, pain. He then reaffirmed the physical limitations found at the first hearing. Because they (and Jenkins mental limitations) were the same as before, he simply relied on Mr. Durbin's testimony about the 4,000-5,000 jobs as evidence of Jenkins' nondisability.
 
 
 18
 Jenkins appealed the ALJ's decision to the Appeals Council, which let it stand as the SSA's final decision. He then took the matter to the district court (under 42 U.S.C. §§ 405(g), 1383(c)(3)) where, after consent of the parties, 28 U.S.C. § 636(c)(1), Magistrate Judge Clifford J. Proud affirmed.
 
 
 19
 Batting zero, Jenkins now appeals to us. The standard of review we apply is well-known: We must affirm if the denial of benefits is supported by substantial evidence.
 
 
 20
 Jenkins' first argument, a legal one, is that ALJ Bauer incorrectly applied grid Rule 201.24. It's true that the ALJ stated, in finding # 11, that "Rule 201.24 ... would direct a finding of 'not disabled" ' and it's also true that such a finding is inconsistent with the rule's requirement that Jenkins be able to do the full range of sedentary work. However, in the text of his order, ALJ Bauer explains that he is using the rule simply as a framework, and that it's the significant number of jobs available to Jenkins that call for the finding of nondisabled. And, in finding # 12, he states the existence of numerous jobs as one of his conclusions. Whatever the case, so long as the finding that significant jobs exist has support, finding # 11, at best a typo or at worst a legal error-as an alternative basis for nondisability-is harmless. See Diaz v. Chater, 55 F.3d 300, 307 (7th Cir.1995).
 
 
 21
 After this strikeout, Jenkins juggles his lineup and tries to use the grid to his advantage. He cites to 20 C.F.R. Pt. 404, Subpt. P., Appendix 2, § 201.00(h), which comes into play because it is listed in a footnote to Rule 201.24. Section 201.00(h) contains 2 examples of individuals for whom "a finding of disability is not precluded [because they] do not meet all the criteria of a specific rule and ... do not have the ability to perform a full range of sedentary conduct"-(1) a man less than 45 years old with a high school education who is limited to unskilled sedentary work, but who also has no manual dexterity due to a hand injury, and (2) a 41-year-old man, also limited to sedentary work, who is illiterate and has an IQ of 78. Jenkins claims that his situation is analogous to both of these hypothetical individuals and that he is disabled as well.
 
 
 22
 But even if his situation were analogous, he's wrong on the law. The examples are prefaced with the statement that "a finding of disability is not precluded," not a statement that those individuals are disabled. And after detailing the examples, § 201.00(h) states that a finding of disability would be appropriate, not required. Therefore, the plain language of § 201.00(h) doesn't direct a finding of disability, it only makes it an option. In effect, the footnote simply acts as a reminder that applicants who cannot perform the full range of sedentary work are exempt from Rule 201.24's mandatory finding of nondisability. Abbott, 905 F.2d at 927. In such a case, the SSA must point to actual evidence of available jobs, not just the categorical rule, to show that the applicant isn't disabled. Id.
 
 
 23
 So, ALJ Bauer didn't have to find Jenkins disabled as a matter of law. Instead, he was free to engage in an evidentiary inquiry into the availability of jobs. This brings us to Jenkins' next argument, a claim that ALJ Bauer's findings were simply wrong.
 
 
 24
 ALJ Bauer's conclusion of nondisability was based on a positive answer to the fifth sequential inquiry-i.e. that there were other jobs Jenkins could do. That answer was based on the following reasoning: Jenkins' lack of completely debilitating pain meant that he could still do some minimal activities which qualified him for a significant number of jobs.
 
 
 25
 We first need to consider ALJ Bauer's finding that Jenkins' pain wasn't completely debilitating. The medical evidence supports his decision. Jenkins' own witness, Dr. Naseer, felt that the pain was superficial, rating a 4-5 on a scale of 10, and that Jenkins could walk without problems. His testimony could also be viewed as establishing that Jenkins' "pain" was really more of a "funny sensation," not a sharp pain. As the only objective medical evidence in the record, it forecloses any finding of debilitating pain-and Dr. Naseer's medical records support his testimony by showing that the level of abnormal nerve firings was "few," as opposed to severe, a finding consistent with superficial, not debilitating, pain.
 
 
 26
 Jenkins' only other evidence involved his own complaints of pain.[4] The evidentiary value of such subjective complaints depends on the credibility of the applicant, an issue we leave to the ALJ. Rucker v. Chater, 92 F.3d 492, 496 (7th Cir.1996). Even without this more deferential standard of review, the April 1992 disability report in which Jenkins admitted to normal everyday activities is substantial evidence supporting ALJ Bauer's conclusion. All of Jenkins' subsequent testimony conflicts with this report and can be reasonably disregarded. In 1993, at the first hearing, he said he could sit for 30 minutes and stand for 20. And at the supplemental hearing in February 1994, he reduced his capacity, saying that he could stand for only 3 minutes at a time. While this contradiction would be explained by evidence that neuralgia gets worse with time, such a finding goes against the uncontradicted medical testimony that neuralgia gets better, not worse, with time-because the afflicted muscles die and reduce the funny sensation-as well as Jenkins' admission that he has been the same since the date of his surgery. On top of this, as ALJ Bauer noted, Jenkins' failure to take any regular prescription pain medication until 1993 supports a lack of completely debilitating pain. While the objective medical testimony was that pain medication can only dull the pain, not eliminate it, Jenkins didn't know this fact until he saw Dr. Naseer, in the fall of 1993. So, given the consistency of the pain, it doesn't explain his failure to try pain medication-other than alcohol-earlier.
 
 
 27
 Because the pain wasn't completely debilitating, Jenkins could obviously still do some minimal activities. The question is whether ALJ Bauer's view of the scope of those activities finds support. It does. Dr. Naseer's testimony supports Jenkins' ability to walk, and therefore stand, for 15-30 minutes at a time. Jenkins' testimony that he can barely stand is incredible in light of both Dr. Naseer's testimony and Jenkins' own disability report. As far as sitting for an hour goes, Jenkins cannot dispute it; after all, he can play cards for an hour at a time. His ability to lift 5 pounds is admitted as well, because Dr. Morgan said he could lift twice that amount. And, the twisting and bending limitations track Dr. Buck's findings that Jenkins couldn't move his trunk without pain.
 
 
 28
 Jenkins' gripe is that ALJ Bauer didn't include a reaching and leaning limitation. That much is true. However, while he did argue that these limitations should have been included in the hypothetical posed to vocational expert Durbin, he never argued that ALJ Bauer erroneously excluded reaching and leaning limitations-either with the Appeals Council or before Magistrate Judge Proud. So, one way of looking at the issue would be to find a waiver of the argument. Brewer v. Chater, 103 F.3d 1384, 1393 (7th Cir.1997). But, where Jenkins has pressed the issue of reaching and leaning limitation and the ALJ clearly excluded such limitations, we hesitate to find waiver. Still, sadly for Jenkins, there is substantial evidence in support of ALJ Bauer's decision to leave the reaching and leaning limitations out. Dr. Buck, Jenkins' urologist, stated only that Jenkins had trouble bending his trunk and that he could move his arms freely, which presumably includes reaching. And Dr. Naseer, the only objective support for such a limitation, said that Jenkins' pain was superficial. This medical testimony is hardly enough for a finding of disabling pain from reaching or leaning, which again leaves only Jenkins' subjective complaints-which formed the basis for Dr. Morgan's determination of reaching problems-that both the stretching of the nerve area and the rubbing of his clothes against the area make the pain involved in reaching and leaning totally debilitating. Because of the lackluster medical support for these complaints, ALJ Bauer was free to ignore them in light of his view about Jenkins' lack of credibility.
 
 
 29
 With support for ALJ Bauer's limitations, we can now see whether there was substantial evidence of available jobs for Jenkins. Vocational expert Durbin's opinion that there were 4,000-5,000 available jobs came in response to a question, posed by ALJ Bauer, that incorporated all Jenkins' limitations. Jenkins admits that the jobs fit within the limitations ALJ Bauer established for him; his claim is simply a rehashing of his last argument, that these jobs required reaching and leaning, of which he wasn't capable. But because the limitations, which didn't include reaching and leaning limitations, were reasonable, this argument fails, too, leaving Durbin's uncontradicted testimony as more than substantial evidence of the availability of significant jobs.
 
 
 30
 This conclusion means that ALJ Bauer correctly answered the fifth sequential inquiry affirmatively, in favor of SSA and against Jenkins. And, as this answer requires a finding of nondisability, which ALJ Bauer properly entered, it's strike three on Jenkins' last claim. Therefore, we AFFIRM.
 
 
 
 [1]
 In 1993 he took a new IQ test but, although he scored worse than his 1988 test-receiving a 70 verbal, 69 performance, and 68 full scale IQ-Dr. Lois Huebner, the psychologist who administered the test, found that Jenkins wasn't cooperative and should have tested at his prior level. She found that despite his low IQ and his alcoholism (up to a fifth of liquor per day), he still had the mental capacity to deal with the pressures and responsibilities of work
 
 
 [2]
 Jenkins pursued his 1st, 2nd and 4th applications only through the reconsideration stage. However he appealed the denial of his third application to an administrative law judge (ALJ), who, on September 7, 1990, found no disability. While adjudicating the fifth application, ALJ John Bauer found that this earlier determination was res judicata for the period before September 7, 1990-and he declined to reopen it. Jenkins asks us to review the refusal to reopen his earlier case but, with no constitutional violation involved, we lack jurisdiction to do so. Califano v. Sanders, 430 U.S. 99, 108-09, 97 S.Ct. 980, 51 L.Ed.2d 192 (1979)
 
 
 [3]
 Dr. Morgan's report indicates that the limitations were based on Jenkins' subjective complaints. On the line where Dr. Morgan was supposed to list medical support for his conclusion he wrote "none."
 
 
 [4]
 Dr. Morgan's statement was based soley on Jenkins' complaints, see supra note 3, and Dr. Buck's statement was based in part on those complaints, so they rise and fall with Jenkins' credibility. See Diaz, 55 F.3d 300, 317 (7th Cir.1995). To the extent Dr. Buck's findings were based on medical evidence-the kidney infection and minor back problems-this medical evidence is insufficient to support a disability, and besides, this medical pales next to Dr. Naseer's specific findings