985 F.2d 560
 15 O.S.H. Cas. (BNA) 2118, 1993 O.S.H.D. (CCH)
P 29,958
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Lynn MARTIN, Secretary of Labor, Petitioner and Cross-Respondent,
v.
GENERAL DYNAMICS LAND SYSTEMS, INC., Respondent and Cross-Petitioner,
The Occupational Safety and Health Review Commission, Respondent.
 Nos. 91-4052, 91-4054.
 United States Court of Appeals, Sixth Circuit.
 Jan. 26, 1993.
 
 Before BOGGS and SILER, Circuit Judges, and LAMBROS, Chief District Judge.*
 PER CURIAM.
 
 
 1
 The Secretary of Labor petitions this court for review of the Occupational Safety and Health Commission's ("the Commission") determination that General Dynamics Land Systems, Inc. ("General Dynamics") did not "willfully" violate 29 U.S.C. § 654(a)(1), as that term is used in 29 U.S.C. § 666(a). General Dynamics cross-petitions for review of the Commission's determination that it otherwise violated this section. We deny both petitions and affirm the Commission's order.
 
 Background
 
 2
 During 1982 and 1983, General Dynamics personnel used freon solvent in constructing the M-1 Abrams Battle Tank. Freon vaporizes rapidly into a gas which is heavier than air and which, therefore, collects in low, unventilated areas. When it displaces breathable oxygen, as it can inside the M-1 tank, freon inhalation may cause dizziness, asphyxiation, and death.
 
 
 3
 Beginning in August 1982 and continuing through November 1983, several General Dynamics employees suffered symptoms related to freon inhalation. Between March and September of 1983, some employees suffered symptoms while working inside the turret, driver, or crew compartments of M-1 tanks whose turrets and hulls had been "married." General Dynamics developed a response to the freon hazard during a corresponding period.
 
 
 4
 The Occupational Safety and Health Administration ("OSHA") cited General Dynamics for a "willful" violation of § 654(a)(1), after a September 1983 incident in which an employee was found unconscious in an M-1 driver compartment. The citation stated that General Dynamics willfully failed to implement a confined space entry procedure for the M-1 tanks and required its employees to use excessive amounts of freon inside the tanks. The Commission affirmed the citation but vacated OSHA's characterization of the violation as willful.
 
 Analysis
 
 5
 To prove a violation of § 654(a)(1), the Secretary must show that: "(1) the employer failed to render its workplace free of a hazard which was; (2) recognized and (3) caused or was likely to have caused death or serious physical harm." Duriron Co. v. Secretary of Labor: United States Occupational Safety & Health Review Comm'n, 750 F.2d 28, 30 (6th Cir.1984) (citing Southern Ohio Bldg. Systems, Inc. v. Occupational Safety & Health Review Comm'n, 649 F.2d 456, 458 (6th Cir.1981), and Continental Oil Co. v. Occupational Safety & Health Review Comm'n, 630 F.2d 446, 448 (6th Cir.1984), cert. denied, 450 U.S. 965 (1981)). Where the Commission finds that a violation of § 654(a)(1) has occurred, its finding must be affirmed on appeal "if supported by substantial evidence." 29 U.S.C. § 660(a). Substantial evidence is " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " Abbott v. Sullivan, 905 F.2d 918, 922-23 (6th Cir.1990) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). In making its findings, the Commission must consider the record as a whole and must account for that which fairly detracts from the weight of its findings. Abbott, 905 F.2d at 923. Substantial evidence supports each of the findings which are now challenged.
 
 
 6
 1. The turret, driver, and crew compartments of the "married" M-1 tank are confined spaces.
 
 
 7
 General Dynamics claims that the Commission erred in finding that the turret, driver, and crew compartments of the married M-1 tank are confined spaces. It alleges that the Commission erred (1) in relying on the contradictory testimony of compliance officers and experts; (2) by ignoring the testimony of a witness who purportedly determined that the M-1 tank's compartments were not confined spaces; (3) by failing to account for all of the M-1 tank's pathways of ingress and egress; and (4) by failing to label the M-1 tank's compartments as spaces intended for "continuous employee occupancy." However, General Dynamics has not established the truth of its four factual predicates. It therefore presents no challenge to the substantial evidence which otherwise supports the Commission's finding.
 
 
 8
 (1) First, the Commission did not err in relying on the testimony of compliance officers and experts because this testimony does not conflict. Each of the experts, Sheldon Rabinovitz, Rafael Moure, and David Morgan, defined confined space in terms which are essentially consistent. Each, that is, testified that confined space is space with restricted means of ingress and egress, and without natural ventilation. While the testimony of each expert employed distinctive vocabulary and was more or less comprehensive, these variations create no inconsistency. In any event, each witness concluded that the compartments were confined spaces.
 
 
 9
 General Dynamics makes much of facts which tend to show that some witnesses did not decide that the M-1's compartments were confined spaces until after the disputed citation was issued. In this regard, General Dynamics points out that Moure did not explain why the M-1 compartments were confined spaces in his written report to OSHA. General Dynamics also asserts that Charles Farrugia, who thought the M-1 tank's compartments were confined spaces in both the married and unmarried configurations, did not advise General Dynamics of this opinion until after the citation was issued. However, this evidence relates to the time when certain individuals determined that the M-1 contained confined space and reveals no conflict in the testimony. Accordingly, the Commission properly relied on the testimony of the compliance officers and experts to the effect that the tank compartments were confined spaces.
 
 
 10
 (2) Second, the Commission did not err by ignoring Farrugia's testimony. General Dynamics claims this testimony shows that Farrugia considered the M-1 tank and "specifically" excluded it from his list of confined spaces. However, Farrugia's testimony indicates that he left the M-1 tank off the list, despite thinking about the M-1 "in general," because he did not "know where [employees] were using freon and exactly what cleaning tasks they were doing." Thus, Farrugia's testimony shows that he lacked the knowledge required to exclude the M-1, intentionally and specifically, from his list. The Commission properly discounted the significance of this omission.
 
 
 11
 (3) Third, the Commission did not err even if it did, as alleged by General Dynamics, fail to consider certain aspects of the M-1 tank's physical structure. General Dynamics argues that in deciding that the driver compartment was a confined space the Commission ignored "two additional large hatch openings, through which persons may [move between the driver and crew compartments] ... when the tank's gun is pointed" backwards. However, although the openings may simplify movement between compartments, their existence does not further General Dynamics' position because both compartments are confined spaces. The existence of hatches connecting pockets of confined space does not alter the conclusion that the M-1 tank harbored confined space.
 
 
 12
 (4) Fourth, the Commission did not err in refusing to label the M-1 tank's compartments "continuous employee occupancy" spaces. Such a determination would have exempted General Dynamics from its obligation to form and implement a confined space entry procedure for the tanks. However, the compartments of the married M-1 tank were not "continuous employee occupancy" spaces because they were not intended for continuous employee occupancy during manufacturing.
 
 
 13
 Expert testimony showed that the compartments of the married M-1 tank were not intended for continuous employee occupancy during manufacturing. This testimony further established that the continuous occupancy exception applies only to space which is being used for its intended purpose. Thus, to cite an example used by Morgan, a space capsule intended for continuous occupancy upon completion nonetheless was a confined space during construction. Likewise, the compartments of an M-1 tank, during construction and before its ventilation systems became operative, were confined spaces.
 
 
 14
 In sum, General Dynamics has not established the verity of the factual predicates it relies on to challenge the Commission's finding that the M-1 tank's compartments are confined spaces. Because substantial evidence otherwise supports this finding, we uphold it on appeal.
 
 
 15
 2. The use of freon in the confined spaces of the "married" M-1 tank constituted a recognized hazard.
 
 
 16
 General Dynamics asserts that the Commission did "not determine whether the tank's alleged designation as a confined space was a recognized hazard." To the contrary, the Commission found that the parties did "not dispute that employee entry into a confined space is a recognized hazard" and "conclude[d] that General Dynamics recognized or should have recognized that employee entry into the 'married' tanks after the use of freon exposed employees to a confined space hazard." We affirm the Commission's conclusion because substantial evidence supports it.
 
 
 17
 The question whether a hazard is recognized may be resolved by determining the actual knowledge of the employer. Continental Oil Co. v. Occupational Safety & Health Review Comm'n, 630 F.2d 446, 448 (6th Cir.1980), cert. denied, 450 U.S. 965 (1981). In this regard, the record shows that General Dynamics was aware that, between March and September of 1983, several of its employees suffered the effects of freon inhalation while working in the M-1 tank. In April 1983, General Dynamics issued a bulletin explaining the hazards of freon and requiring the use of ventilation when working with freon in "enclosed spaces such as the inside of tracked vehicles." The company also ran an air sampling test in one tank and issued another safety bulletin which reiterated procedures for using freon inside tank compartments.
 
 
 18
 General Dynamics cannot rely on OSHA's prior failure to issue a citation relating to the confined space hazard inside the tanks as a basis for arguing that it lacked knowledge of the hazardous condition. See Columbian Art Works, Inc., 10 O.S.H.Cas. (BNA) 1133 (October 28, 1981). Likewise, even if, as General Dynamics claims, the Secretary's experts, the Department of Labor, and the Union did not recognize that the freon hazard was a confined space hazard when OSHA issued the disputed citation, this does not preclude a finding that the hazard was "recognized" by General Dynamics under § 654(a)(1). This is particularly true where, although the Secretary and Moure cataloged confined space at the General Dynamics facility, they were not familiar with the use of freon inside the tanks.
 
 
 19
 In short, as the Commission found, the employee "incidents, together with the filing of formal grievances during the relevant time period, put General Dynamics on notice that its employees were being exposed to a confined space hazard caused by the use of freon in the tanks." Therefore, substantial evidence supports the Commission's finding that General Dynamics recognized the confined space hazard inside the M-1 tank.
 
 
 20
 3. General Dynamics did not willfully violate § 654(a)(1).
 
 
 21
 Action taken knowingly in disregard of its legality is action which willfully violates § 654(a)(1). 29 U.S.C. 666(a); Empire-Detroit Steel Div. v. Occupational Safety & Health Review Comm'n, 579 F.2d 378, 384 (6th Cir.1978). A "showing of evil or malicious intent is not necessary to establish willfulness." Id. at 385. Nevertheless, proof of something more than mere knowledge of the hazard is required to establish a willful violation. St. Joe Minerals Corp. v. Occupational Safety & Health Review Comm'n, 647 F.2d 840, 847-48 (8th Cir.1981). An employer's failure to take corrective action against a known and recognized hazard is sufficient in this regard. See Empire-Detroit, 579 F.2d at 385. Substantial evidence supports the Commission's finding that General Dynamics' conduct was not willful.
 
 
 22
 The Secretary claims that Empire-Detroit, a case finding a willful violation of § 654(a)(1), supports the conclusion that General Dynamics' conduct was willful. In Empire-Detroit an employer failed to remedy a known and recognized hazardous condition associated with the disposal of steel slag "[f]rom June, 1973, when a bulldozer operator was killed by an explosion, until September, 1974, when two explosions injured ten employees." Id. By September 1974, the employer had sporadically reinstituted a safer method of steel slag disposal in one of five open hearth furnaces. Id. It did not abate the hazard in the other four furnaces and agreed only after the second incident to cooperate in a union proposed hazard abatement program. Id. Under these circumstances, where the employer made no efforts between incidents and responded lamely after the second incident, substantial evidence supported the finding that a willful violation had occurred. Id. at 385-86. That was a failure to take corrective action against a known hazard.
 
 
 23
 This case is distinguishable from Empire-Detroit even if it is conceded, as the Secretary argues, that General Dynamics instituted inadequate employee training, failed to measure freon exposure, and took measures to control freon use which were not completely effective. This is so because, while the use of freon in the confined space compartment of the M-1 tank was a recognized hazard and while General Dynamics' conduct was not ideal, it progressively developed a response to this hazard. To begin with, General Dynamics attempted to limit freon use by ordering reduced usage according to the company's "one pint rule." Furthermore, even though General Dynamics did not make it feasible for employees to test atmospheric freon levels, it provided ventilation equipment, one-pint spray bottles, and alternative cleaning fluids.[1] Thus, General Dynamics did not fail to act when incidents put it on notice that its safety regimen was defective.
 
 
 24
 This case presents facts which are similar to those of Secretary of Labor v. Marmon Group, Inc., 11 O.H.S.Cas. (BNA) 2090 (July 19, 1984). Marmon involved the violation of machine-guarding standards, apparently promulgated under 29 U.S.C. § 654(a)(2) to protect die press operators. In early 1979, after an operator was injured, Marmon was cited for violating the standards. Id. at 2091. Marmon was later found to be in compliance with the standards in April of 1979. Id. However, in mid-1979, another press operator was injured when Marmon failed to adjust a die press in violation of a standard under which Marmon had not been previously cited. Id. at 2092. In refusing to characterize the violation as willful, the Commission stated as follows:
 
 
 25
 It is not enough for the Secretary simply to show a lack of diligence or carelessness in failing to discover or eliminate a violation. On the contrary, where the record establishes that the employer has made a good faith effort to comply with a standard or to eliminate a hazard to its employees, a willful charge is not justified even though the employer's efforts are not entirely effective or complete.
 
 
 26
 Id. (emphasis added).
 
 
 27
 Like the employer in Marmon, General Dynamics was cited for violating the Occupational Safety and Health Act before the litigation-precipitating incident occurred. Marmon's prior citation involved machine-guarding standards which were similar to the standard involved in the later citation. General Dynamics' prior citations involved violations of § 654(a)(1) which were similar to the instant violation. The Commission found that the steps General Dynamics took amounted to a good faith attempt to comply with the Act. The fact that dangerous incidents involving freon inhalation continued into late 1983 shows that the steps were not "entirely effective or complete." On the other hand, they do not justify finding there was not substantial evidence to uphold the Commission's decision of no willfulness.
 
 Conclusion
 
 28
 Substantial evidence supports each of the Commission's findings. For this reason, the petitions of the parties are DENIED and the Commission's order is AFFIRMED.
 
 
 
 [1]
 Like the employer in Empire-Detroit, General Dynamics also planned measures of hazard abatement which were to be implemented prospectively. These measures included "a comprehensive freon safety program for 490 employees 'who would come into contact with the solvent.' "