**Glenn LENON, Plaintiff,**

v.

**Kenneth S. APFEL, Commissioner of Social Security, Defendant.**

**No. 99–1112.**

United States District Court, W.D. Tennessee, Eastern Division.

Feb. 15, 2001.

Beth S. Bates, Jackson, TN, for Plaintiff.

William W. Siler, Veronica F. Coleman, Memphis, TN, for Defendant.

## REPORT AND RECOMMENDATION

BREEN, United States Magistrate Judge.

The plaintiff, Glenn Lenon ("Lenon"), appeals from a decision of the Commissioner of Social Security denying his application for disability and supplemental security insurance benefits. The appeal has been referred to the undersigned for report and recommendation.

## PROCEDURAL HISTORY

Lenon filed his applications for disability and supplemental security insurance benefits on April 5, 1994 alleging disability having an onset date of January 12, 1994. (Transcript at pages 120–25, hereafter "TR-____") The applications were denied initially and upon reconsideration. (TR–112–16, 126–35) The plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), which was conducted before ALJ Thomas A. Stroud on January 25, 1996. (TR–44–80) Lenon, who was represented by counsel, appeared and testified. The ALJ also heard the testimony of Jacqueline Lenon, claimant's spouse, and Fred Miller, a relative. A supplemental hearing was conducted on April 30, 1997, when the ALJ again heard the testimony of the claimant along with that of Nancy Hughes, a vocational expert ("VE"). (TR–81–110) The ALJ denied plaintiff's application in a decision dated January 29, 1998. (TR–23–35) The ALJ's decision became the final decision of the Secretary when the Appeals Council denied Lenon's request for review on April 15, 1999. (TR–6–7) Plaintiff filed this action seeking review of the final decision of the Secretary pursuant to 42 U.S.C. § 405(g). In his brief, the claimant argues that the ALJ erred in (1) substituting his opinion for that of medical experts and (2) finding that jobs exist in significant numbers in the regional economy which he could perform and that he was, therefore, not entitled to benefits. Thus, Lenon contends, the decision of the ALJ was not supported by substantial evidence.

## THE FIVE–STEP EVALUATION

A multi-step evaluation set forth in the Social Security Regulations (the "Regulations") is utilized to determine whether a claimant is entitled to disability benefits. 20 C.F.R. §§ 404.1520(a), 416.920(a) (2000). If it is found at any step in the analysis that the claimant is not disabled, the claim is not reviewed further. 20 C.F.R. §§ 404.1520(a), 416.920(a) (2000). First, the claimant must not be engaged in substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b) (2000). Second, he must suffer from a severe physical or mental impairment. 20 C.F.R. §§ 404.1520(c), 416.920(c) (2000). The ALJ must at the third step determine whether the claimant has an impairment that meets or equals the criteria contained in the Regulations' Listing of Impairments

set out in Appendix 1 thereto. 20 C.F.R. §§ 404.1520(d), 416.920(d) (2000). If a claimant's impairment meets or equals a Listing, he is found disabled. 20 C.F.R. §§ 404.1520(d), 416.920(d) (2000). In the event the ALJ decides that a listed impairment has not been met or equaled, he must then move to the fourth step in the analysis and consider the claimant's residual functional capacity[1] and the physical and mental demands of his past relevant work. 20 C.F.R. §§ 404.1520(e), 416.920(e) (2000). If the claimant is still capable of performing his past work, he is not disabled. 20 C.F.R. §§ 404.1520(e), 416.920(e) (2000). Upon a determination that the claimant cannot engage in his past relevant work, the ALJ must advance to the fifth and final step of the evaluation and analyze whether the claimant can perform other work. 20 C.F.R. §§ 404.1520(f), 416.920(f) (2000). In doing so, he is to consider residual functional capacity along with vocational factors including age, education, and past work experience. 20 C.F.R. §§ 404 .1520(f), 416.920(f) (2000). At this stage, the ALJ may employ the Medical–Vocational Guidelines in reaching his determination. *Abbott v. Sullivan*, 905 F.2d 918, 926 (6th Cir.1990). If the ALJ concludes that there is no other work the claimant can perform, he is found to be disabled. 20 C.F.R. §§ 404.1520(f), 416.920(f) (2000).

## THE ALJ'S DECISION

After considering the medical record, including the plaintiff's hearing testimony, the ALJ determined that Lenon was not under a disability as defined in the Social Security Act (the "Act"). (TR–35) Utilizing the multi-step evaluation process set forth in the Regulations, the ALJ made the following findings:

1. The claimant met the disability insured status requirements of the Act on January 12, 1994, the date the claimant stated he became unable to work, and continues to meet them through the date of this decision.

2. The claimant has not engaged in substantial activity since January 12, 1994.

3. The medical evidence establishes that the claimant has severe status post surgery for avascular necrosis and associated pain and depression, but that he does not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4.

4. The claimant's testimony regarding his limitations and symptoms, including pain, is not fully credible.

5. The claimant has the residual functional capacity to perform the physical exertion and nonexertional requirements of work except for lifting no more than twenty pounds occasionally, ten pounds frequently with no overhead reaching with the right arm (20 CFR 404.1545 and 416.945).

6. The claimant is unable to perform any of his past relevant work.

7. The claimant's residual functional capacity for light work is further reduced by his fair ability to follow work rules, deal with work stresses, function independently, maintain concentration/attention, follow complex job instructions, behave in an emotionally stable manner, relate predictably in social situations and demonstrate reliability.

---

1. "Residual functional capacity" is defined in the Regulations as "the maximum degree to which the individual retains the capacity for sustained performance of the physical-mental requirements of jobs[.]" 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 200.00(c) (2000).

8. The claimant is 43 years old, which is defined as a younger individual (20 CFR 404.1563 and 416.963).

9. The claimant has an eleventh grade education (20 CFR 404.1564 and 416.964).

10. The claimant has acquired work skills such as communication skills and some clerical skills which he demonstrated in past work, and which, considering his residual functional capacity, can be applied to meet the requirements of skilled or semiskilled work functions of other work (20 CFR 404.1568 and 416.968).

11. Based on an exertional capacity for light work and the claimant's age, educational background, and work experience, section 404.1569 of Regulations No. 4 and section 416.969 of Regulations No. 16 and Rule 202.19, Table No. 2, of Appendix 2, Subpart P, Regulations No. 4 would direct a conclusion of "not disabled."

12. Although the claimant's additional nonexertional limitations do not allow him to perform the full range of light work, using the above-cited rule as a framework for decision-making, and crediting the testimony of a vocational expert, there is a significant number of jobs in the national economy which he could perform. Examples of such jobs are: interviewing clerk (117 locally), escort driver (9 locally) and messenger (56 locally). Other jobs, included gate guard at a factory, inventory clerk, general security guard and some dispatching jobs.

13. The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

(TR–33–35)

## STANDARD OF REVIEW

Judicial review of the Secretary's decisions is limited to determining whether the Secretary's findings are supported by substantial evidence and whether the Secretary employed the proper legal standards. Substantial evidence is more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. [The] court does not try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility.

In determining the existence of substantial evidence, [the] court must examine the administrative record as a whole. If the Secretary's decision is supported by substantial evidence, it must be affirmed even if the reviewing court would decide the matter differently, and even if substantial evidence also supports the opposite conclusion.

*Cutlip v. Secretary of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir.1994) (internal citations omitted).

## THE CLAIMANT'S CONDITION

Lenon was born on March 4, 1954 and was 43 years old on the date of his disability hearing. The claimant completed the tenth grade[2] and had worked as a spool cleaner and stacker at a recycling plant, country club groundskeeper, nursing home aide, assembly plant worker, hospital orderly, and construction laborer.

---

2. Although other portions of the record indicate that Lenon had an eleventh grade education, he confirmed during his testimony that he was passed to the eleventh grade but actually completed only the tenth grade.

The medical records contained in the transcript began with records from February 1994, when the claimant visited a hospital emergency room complaining of sharp anterior chest wall pain, which intensified when he took deep breaths. Chest x-rays revealed a left upper lobe infiltrate plus cavitary areas in both lungs suggestive of tuberculosis. (TR–175–78) The radiology report noted an interstitial alveolar process which was bilateral, with multiple cavities seen in the left lung field, upper, outer and in the left lingular area. Other cavities were observed in at least three areas on the right: one in the lower lung field, one in the mid, and one in the apex. There were enlarged nodes on the left with elevation of the left hilum and some fibrotic changes in the left upper lung field and right apex. (TR–180) The plaintiff reported a ten pound weight loss over approximately six months. He was hospitalized for further evaluation and treatment. (TR–175–78)

A consultative examination was conducted by Ronald A. Weaver, M.D. in May 1994. The claimant complained of shortness of breath and reactions to household cleaners and cooking odors, which made him nauseated and aggravated his cough. He also reported pain in the right shoulder that had increased gradually. He was unable to raise his right arm above his head; was often weak and tired; and coughed after walking short distances, exposure to warm environments, and upon the slightest exertion. Examination revealed lungs clear to auscultation and percussion with prolonged expiration and increased coughing on forced expiration. The plaintiff elevated and abducted the right shoulder on 90 degrees. Dr. Weaver diagnosed active pulmonary tuberculosis and right shoulder hand syndrome. (TR–192–93)

Dr. John Larkin, who examined Lenon on July 25, 1994, noted continuing tuberculosis and discomfort in the right shoulder with limitation of motion. (TR–204) In a medical assessment completed in early August, Dr. Larkin and W. Robert Routon, M.D. opined that the plaintiff could perform no lifting as a result of medical findings suggestive of avascular necrotic changes in the humeral head. Lenon was able, according to the physicians, to stand or sit for six hours in an eight-hour workday and suffered from mild to moderate fatigue on exertion. (TR–201) The plaintiff continued to be treated for tuberculosis through July 1994. (TR–204–10) At around that time, he was cleared to return to work from a pulmonary standpoint. (TR–220) Tests conducted in February 1995 revealed no evidence of active tuberculosis. (TR–287)

In August 1994, Dr. Routon noted that plaintiff suffered from significant right shoulder pain. X-rays revealed signs of aseptic necrosis of the humeral head and possibly an articular fracture. Bone scans confirmed these findings. As a result, Dr. Routon referred Lenon to an orthopaedic specialist. (TR–203, 220) The following month, Lenon underwent a right shoulder hemi-arthroplasty at the Veterans Hospital. (TR–232–35) Physical examination at the time of surgery indicated clear lungs and pain in the right shoulder in all ranges of motion. (TR–221) The plaintiff began shoulder range of motion therapy shortly after surgery. (TR–256–57) Follow-up examinations in October and November 1994 revealed continued difficulties with ability to raise the arm any higher than before the surgery, as well as severe pain. (TR–262) In late November, the claimant reported an inability to attend occupational therapy sessions, but was performing home exercises as instructed. (TR–263)

The record reflects that, in September 1995, Lenon received counseling at Carey Counseling Center, reporting a history of alcohol abuse, inability to work, depres-

sion, insomnia, irritability, and crying spells caused at least in part by problems with his physical disability. (TR–305–11) Apparently, he attended counseling sessions for two to three months and was not treated with medication. (TR–333) School records contained in the file reveal I.Q. scores of 86 and 75. (TR–312)

In March 1996, the plaintiff was examined by Don Lyerly, M.D. at the request of the state disability service. Lenon's chief complaint at that time was pain in the right shoulder. In his report, the physician noted that, although the claimant complained of severe pain and sleeplessness, he took nothing more than Acetaminophen to relieve his symptoms. Examination revealed eight degrees of flexion, 75 degrees of abduction, and poor subjective internal rotation of the right shoulder with normal motion of the right elbow, forearm, wrists, fingers, and thumb. No muscle atrophy of the right shoulder was noted. An enlargement of the right arm seemed to indicate that the plaintiff was using his right arm quite well. Based on his examination, Dr. Lyerly concluded that plaintiff's lifting limit was 30 pounds and that his only functional limitation consisted of an inability to perform work activities with the right upper extremity higher than the right shoulder. Treatment for plaintiff's subjective complaints was not, in the physician's opinion, necessary. (TR–343–45)

A consultative examination was conducted on the claimant on April 9, 1996 by Dr. Robert W. Kennon, a psychologist. At that time, Lenon reported symptoms of sleep disturbance, generalized chronic anxiety, withdrawal, and moodiness, along with feelings of uselessness and hopelessness. Anxiety was heightened when his right arm became painful. It was the physician's impression that the plaintiff's anxiety was directly related to the difficulties with his right shoulder and chronic pain. Lenon reported that he required the assistance of his wife in dressing due to the lack of mobility in his right arm. He did not cook, clean, shop, drive, or do chores. Indeed, according to the plaintiff, there was little he could do, although he had tried. Lenon related that he sat on the couch during the day and watched television. He also attended church services twice a week, but was socially withdrawn and not involved in other activities or hobbies. (TR–332—33) Dr. Kennon concluded that, although the claimant reported that his involvement in social activities had declined significantly since his shoulder problems began and that he had become apathetic, there was nothing to suggest that he would have any significant difficulties in relating to others. Rather, the psychologist determined, Lenon chose to withdraw. In addition, the evaluator opined that the plaintiff was cognitively capable of managing his finances. (TR–334)

Dr. Kennon reported that the claimant was generally cooperative and well groomed. Mood and affect demonstrated clinically significant depressive symptomatology, which the examiner categorized as mild to moderate. Depressive features appeared to be secondary to the decline of Lenon's physical health and the deterioration of his right arm. Emotional state was quite labile with rapidly changing emotions. The claimant admitted to crying spells and becoming easily upset by situational stressors. Psychological and vegetative symptoms of depression were noted, including increased dependency on family members, feelings of hopelessness and helplessness, self-efficacy, pessimism, passivity, withdrawal, anhedonia with an absence of previously pleasurable activities, sleep disturbance, lowered sexual drive, and preoccupation with somatic condition. There was some evidence of mild thought blocking with the sudden cessation of his train of thought. Plaintiff also suffered

from an erratic attention span and problems in remembering details.

There was no indication of incongruence of emotion to ideation or life events, incoherence or irrelevance, thought disorganization, fragmented thought processes, psychotic features, grandiosity of thought, suicidal ideation, bizarre thoughts, obsessive/compulsive features, phobic-type reactions, delusional features, abnormalities of thought content, auditory/visual hallucinations, misperceptions of role or meaning, illusions, or significant memory disturbance. Voice tone, speed of speech, speech productivity, stream of thought, and memory functions were normal. He was oriented as to time, place, person, and with the situation concerned. Cognitively, the psychologist concluded that Lenon appeared to be functioning at the low-average range of intellectual abilities. These abilities were, in the evaluator's opinion, deflated somewhat due to plaintiff's depression. (TR–336) According to tests administered by Dr. Kennon, the plaintiff had a full-scale I.Q. score of 79. (TR–334–35)

Dr. Kennon concluded that Lenon's prognosis was only mildly guarded. It was his opinion that the claimant would benefit from psychotherapeutic intervention, without which his condition would be unlikely to improve. Some chemotherapeutic intervention might also be required. Further, Dr. Kennon stated as follows:

He does not show any deficits in his ability to understand and remember. There are mild deficits in his ability to sustain concentration and persistence. He is easily distracted. He is likely to have difficulty working in proximity with others, without being distracted by them. Social interaction was not found to be significantly impaired. He does show limited adaptive skills. His ability to deal with changes in the work setting and adequately cope with frustrating circumstances and stress is one of the most significant limitations for Mr. Lenon. (TR–337)

In June 1996, Dr. Stephanie Barnes conducted a vocational evaluation on the plaintiff at the request of his attorney. Dr. Barnes noted that, at the time of the evaluation, Lenon was not seeking treatment for his depression but he did attend Alcoholics Anonymous meetings on an irregular basis. He continued to have difficulties with social withdrawal, sleep disturbance, and feelings of hopelessness. At times during the evaluation, he appeared tearful. Upon review of Dr. Kennon's report, Dr. Barnes concluded that the limitations discussed therein "would indicate an individual who is in significant mental distress and would be unable to sustain competitive work." Academic testing, using the WRAT–3, reflected reading, spelling, and arithmetic abilities at the third to fifth grade level. From these scores, Dr. Barnes opined that Lenon was marginally literate and would have difficulty in an employment situation in which academic skills were required beyond very elementary functions. It was the conclusion of the evaluator that, while there were many jobs he could perform from a physical standpoint, "the mental evaluation completed by Dr. Kennon and the academic testing completed during this evaluation would indicate that Mr. Lenon would be disabled from all work as a result of the combination of his impairments." Dr. Barnes further stated that "[t]here is no work existing in significant numbers in the State of Tennessee or the national economy which this gentleman can sustain." She recommended that he return to counseling for treatment and possible medication. (TR–352–55)

Dr. V. Patel, a psychiatrist, examined the plaintiff in October 1996. At the time of the evaluation, Lenon complained of de-

pression due to his inability to work and support his family, caused by the pain in his right shoulder. He reported frustration, sleep disturbance, and feelings of worthlessness. No homicidal or suicidal ideations; auditory, visual or tactile hallucinations; or delusions were noted. The claimant stated that he had stopped counseling after two months because he felt better. Examination revealed that the plaintiff was alert, oriented times three, cooperative with no hostility, and in mild distress. Mood was depressed and affect was mood congruent. Speech was relevant, coherent, and spontaneous. Abstract thinking, similarities, and recent memory were good, with fair remote memory. Insight and judgment were also fair. No abnormal psychomotor activities were observed. (TR–363–66) Dr. Patel opined that Lenon's ability to relate to co-workers, deal with the public, use judgment in public, and interact with supervisors was good, while his ability to follow work rules, deal with work stresses, function independently, and maintain attention and concentration was fair. Plaintiff was capable of understanding, remembering, and carrying out simple and detailed job instructions, but had only a fair capability to understand and execute complex instructions. He was rated "fair" in his abilities to behave in an emotionally stable manner, relate predictably in social situations, and demonstrate reliability. (TR–367–69)

On April 28, 1997, Dr. Barnes issued a supplemental opinion as to plaintiff's condition in light of Dr. Patel's findings. She noted that Dr. Patel provided in his examination report a Global Assessment of Functioning ("GAF") score of 40, which, she stated, would indicate that Lenon suffered from very severe symptoms and would be incapable of sustaining employment with that level of emotional overlay. Dr. Patel's report, in her view, strengthened the conclusions drawn by Dr. Kennon in April 1996. In Dr. Barnes' opinion, the "additional barriers created by the limitations cited by Dr. Kennon and/or Dr. Patel would eliminate [Lenon's] ability to sustain any type of work from an emotional standpoint." (TR–406–07)

At the hearing before the ALJ, the plaintiff testified that he could lift almost nothing with his right arm and perhaps a five pound sack of flour with his left. Whenever he attempted to lift anything with either hand, he had a "jarring" feeling in his arm. He wore a sling on his arm at the hearing. (TR–57–59) Lenon reported that he was able to sit and stand for 30 to 45 minutes at a time before having to lie down due to the pain in his shoulder. (TR–60) The pain was aggravated upon any type of exertion. (TR–68) He attempted to relieve his constant shoulder pain by taking prescription strength Acetaminophen and applying a heating pad. The plaintiff spent his days watching television and performed no household chores. (TR–62) He slept only about four hours per night, because the pain in his shoulder kept him awake, and dozed during the day. Lenon testified that he attended church but did not socialize, take trips, or engage in hobbies. (TR–63) The claimant denied having crying spells or difficulties concentrating or remembering, but admitted being depressed sometimes because he could not provide for his family. (TR–64–65)

According to Fred Miller, who identified himself as Lenon's brother-in-law, the plaintiff spent most of his time sitting around the house depressed because of his inability to financially support his family. (TR–71) Miller reported that, during the last couple of years, the claimant had begun to suffer from mood swings because of the pain in his arm. (TR–72–73) Jacqueline Lenon, plaintiff's wife of 17 years, testified that her husband was moody and depressed. (TR–73–74) She stated that it was difficult for the plaintiff to sleep be-

cause he could not get his arm in a comfortable position. (TR–74)

At the second hearing, Lenon reiterated that his daily activities consisted of sitting around the house watching television. (TR–84–85) At that time, he was unable to do anything with his right arm, as any type of movement produced pain. (TR–85) The ALJ also heard the testimony of VE Nancy Hughes, to whom he posed a hypothetical encompassing Lenon's physical and nonexertional impairments. (TR–91–108) The VE testified that the claimant, in his local economy, could perform the duties of an escort driver in security work, messenger, and inventory clerk, of which there were a total of approximately 182 jobs. Plaintiff was also capable of working as a gate guard or dispatcher. When questioned concerning the plaintiff's GAF score, the VE opined that a score of 40, which indicates an impairment in reality testing and communication, would have vocational significance. Specifically, the VE noted that communication skills and reality observation are required for security guard and information clerk positions. In addition, she stated that the majority of escort drivers are generally independent. Plaintiff's mental impairments would eliminate some, but not all, messenger light delivery, escort driver, dispatching, or security jobs. (TR–95–108).

## THE PLAINTIFF'S ARGUMENTS

▮ In the brief presented to the court, Lenon initially contends that the ALJ's rejection of certain portions of the opinions of Drs. Kennon and Patel were error. An ALJ must not substitute his own judgment for a doctor's conclusion without relying on other medical evidence or authority in the record. *Clifford v. Apfel,* 227 F.3d 863, 870 (7th Cir.2000); *Sigler v. Secretary of Health and Human Servs.,* 892 F.Supp. 183, 187–88 (E.D.Mich. 1995). When there is a conflict in the evidence, the ALJ may choose what evidence to credit but "cannot reject evidence for no reason or for the wrong reason." He must consider all of the evidence and give some reason for discounting the evidence rejected. *Plummer v. Apfel,* 186 F.3d 422, 429 (3d Cir.1999). Generally speaking, the opinion of a treating physician is to be afforded substantial deference in Social Security cases. *Walker v. Secretary of Health and Human Servs.,* 980 F.2d 1066, 1070 (6th Cir.1992). Such deference is only appropriate, however, when the opinion is "supported by sufficient clinical findings and [is] consistent with the evidence." *Cutlip,* 25 F.3d at 287; *see also Young v. Secretary of Health and Human Servs.,* 925 F.2d 146, 151 (6th Cir.1990). An ALJ who chooses to reject a treating physician's opinion must articulate his reasons for doing so. *Shelman v. Heckler,* 821 F.2d 316, 321 (6th Cir.1987).

With respect to the plaintiff's mental impairments, which are the focus of this appeal, the ALJ discounted Dr. Kennon's conclusion that Lenon possessed poor ability to deal with work stresses. The ALJ determined that this finding was inconsistent with Dr. Kennon's diagnosis of mild to moderate depression and his observation that there was no clear suggestion of significant difficulties in appropriately relating to others. There was a "logical relationship," the ALJ stated, between an assessment of mild to moderate depression and the conclusion that a claimant cannot deal with work stresses. Thus, Dr. Kennon's diagnosis did not indicate a level of impairment to support a finding that plaintiff did not possess the ability to deal with stresses of the workplace. (TR–31) The ALJ also expressed concern about the conclusions drawn by Dr. Patel. He noted that the psychiatrist's report reflected depressive disorder but fair or better ability in all categories considered, which was, in the ALJ's view, inconsistent with a GAF score of 40. A GAF score of 31–40 is

indicative of "some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas such as work or school, family relations, judgment, thinking or mood." *Kirves v. Callahan,* No. 96–5179, 1997 WL 210813, at \*2 n. 1 (6th Cir. April 25, 1997). Therefore, the ALJ refused to give weight to the GAF score provided by Dr. Patel, concluding that it was "totally inconsistent" with the findings of fair or good ability to make occupational, performance, and personal-social adjustments contained in the report. The ALJ went on to conclude, upon weighing all of the psychological and psychiatric evidence, that the claimant's mental abilities included a "fair ability to follow work rules, deal with work stresses, function independently, maintain concentration/attention, follow complex job instructions, behave in an emotionally stable manner, relate predictably in social situations and demonstrate reliability." (TR–31–32)

It is the opinion of the undersigned that the ALJ, in declaring, based on his own interpretation of Dr. Kennon's findings, that one could not suffer from mild to moderate depression and have a poor ability to deal with the stresses of the workplace, gave in to the temptation to play doctor in this case. On the other hand, a review of the ALJ's opinion reveals that his rejection of the GAF score as inconsistent with the remainder of Dr. Patel's findings was supported by substantial evidence and, therefore, not in error. *See Rivera v. Apfel,* No. 98 C 2682, 2000 WL 150761, at \*10 (N.D.Ill. Feb. 7, 2000) (ALJ's rejection of GAF rating inconsistent with physician's findings not error as rating not supported by substantial evidence); *Gamblin v. Commissioner,* No. CA3:98–CV–0916–BC, 1999 WL 184123, at \*7 (N.D.Tex. March 26, 1999) (ALJ entitled to disregard doctor's opinion where record supported ALJ's finding that GAF score was inconsistent with other evidence,

including physician's own examination notes). Dr. Patel's examination notes reveal relevant, coherent, and spontaneous speech; judgment categorized as "fair"; good ability to relate to others; fair capability to deal with work stresses; and fair ability to relate predictably in social situations. The ALJ could have reasonably concluded that these findings were inconsistent with the conclusions necessary to support a GAF score of 40.

■ As a result of the substitution of his own judgment for that of Dr. Kennon, the ALJ made conclusions about the extent of plaintiff's mental impairments and the effect of those impairments on his ability to work that did not fairly take into account all of the evidence. Therefore, it is the recommendation of the undersigned that this matter be remanded to the ALJ for a determination based on all of the psychological evidence. *See Winfrey v. Chater,* 92 F.3d 1017, 1022–23 (10th Cir. 1996).

■ The plaintiff also contends that the ALJ erred in finding that a significant number of jobs existed which he could perform. Specifically, Lenon first argues that the ALJ's conclusion that he was able to perform the duties of the 117 inventory clerk jobs named by the VE and referred to in his decision was not supported by substantial evidence. Although the ALJ stated in his opinion that the VE testified that there were 117 interviewing clerk positions in the local economy which plaintiff could perform, a review of the record reveals that the 117 jobs the VE referred to were in fact inventory clerk jobs. (TR–96–97) There is no indication in the hearing transcript that the ALJ received testimony as to the number of interviewing clerk jobs available in the local economy. According to the VE, inventory clerk positions require the ability to carry out very complex instructions with regard to keep-

ing track of inventory. Based on the physical limitations set forth in the hypothetical and the mental limitations contained in Dr. Kennon's report, it was the opinion of the VE that plaintiff could not perform the duties of an inventory clerk. The VE's conclusion that Lenon would not be able to perform a job requiring very complex job instructions is uncontroverted by the record. Indeed, the ALJ recognized in his findings that the claimant's residual functional capacity was reduced by his fair ability to follow complex job instructions. Thus, a finding by the ALJ that 117 jobs, either for an interviewing clerk or an inventory clerk, existed in the local economy that plaintiff could perform was not supported by substantial evidence.

Plaintiff also takes issue with the ALJ's conclusion, based on the testimony of the VE that there were 182 jobs in the local economy which Lenon could perform, that a significant number of jobs existed in the national economy to which plaintiff could make a vocational adjustment. The VE testified only as to the number of jobs in the local economy. Plaintiff argues that 182 jobs, less the 117 eliminated for the reasons set forth above, do not constitute a "significant number."

Under the Regulations, "work exists in the national economy when it exists in significant numbers either in the region where [the claimant] live[s] or in several other regions of the country." 20 C.F.R. § 404.1566(a) (2000). There is no bright line boundary separating a "significant number" from insignificant numbers of jobs. *Hall v. Bowen,* 837 F.2d 272, 275 (6th Cir.1988). What constitutes a significant number of jobs is to be determined on a case-by-case basis. *Id.* In making its determination, the court should consider "the level of claimant's disability; the reliability of the vocational expert's testimony; the reliability of the claimant's testimony; the distance claimant is capable of travel-

ling to engage in the assigned work; the isolated nature of the jobs; the types and availability of such work; and so on." *Id.; see also Born v. Secretary of Health and Human Servs.,* 923 F.2d 1168, 1174 (6th Cir.1990). These factors are suggestions only; the ALJ is not required to explicitly consider each factor. *Harmon v. Apfel,* 168 F.3d 289, 292 (6th Cir.1999). The "decision should ultimately be left to the trial judge's common sense in weighing the statutory language as applied to a particular claimant's factual situation." *Hall,* 837 F.2d at 275.

In this case, no evidence was presented at the hearing as to the number of jobs available in the national or regional economies which plaintiff could perform. Rather, the VE testified only as to jobs within 75 miles of the plaintiff's residence. Using a common sense approach, it is the opinion of the undersigned that the number of jobs identified by the VE—65 after elimination of the 117 interviewer jobs from the mix— is not a significant number for purposes of the Regulations. Other courts have refused to find that small numbers of jobs identified by a VE represent a "significant number" of jobs in the economy. *See West v. Chater,* No. C–1–95–739, 1997 WL 764507, at *2–3 (S.D.Ohio Aug. 21, 1997) (as a matter of law, 100 jobs in the local economy not significant); *Mericle v. Secretary of Health and Human Servs.,* 892 F.Supp. 843, 847 (E.D.Tex.1995) (870 jobs in the state of Texas not significant); *Waters v. Secretary of Health and Human Servs.,* 827 F.Supp. 446, 448–50 (W.D.Mich.1992) (1,000 jobs in the state of Michigan not significant). Therefore, it is the opinion of the undersigned that the ALJ's conclusion that a significant number of jobs exist in the economy which the plaintiff could perform was not supported by substantial evidence.

Accordingly, based on the foregoing, it is RECOMMENDED that the decision of the ALJ, pursuant to sentence four of 42 U.S.C. § 405(g), be REVERSED and REMANDED to the Commissioner for further proceedings in accordance herewith.