**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 14a0052n.06

Case No. 13-5841

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Jan 21, 2014
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| JOSEPH PETERSON, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE EASTERN DISTRICT OF |
| COMISSIONER OF SOCIAL SECURITY, | ) | KENTUCKY |
| | ) | |
| Defendant-Appellee. | ) | OPINION |
| | ) | |

BEFORE: COLE, GILMAN, and DONALD, Circuit Judges.

**Bernice B. Donald, Circuit Judge.** Joseph Peterson appeals the district court's grant of summary judgment to Appellee, the Commissioner of Social Security ("Commissioner"), in this 42 U.S.C. § 405(g) suit challenging the Commissioner's final decision denying Peterson's application for Supplemental Security Income ("SSI") under the Social Security Act ("the Act"). Peterson contends that the Administrative Law Judge ("ALJ") who reviewed his case erred in finding that he was "not disabled" and therefore not entitled to benefits, and that the district court erred in finding that the Commissioner's conclusion adopted from the ALJ was supported by substantial evidence. In particular, Peterson argues that the ALJ should have found that he was disabled because he has a mental impairment under 20 C.F.R. Pt. 404, Subpt. P, App'x 1

§ 12.05C. Because the Commissioner's decision is supported by substantial evidence, we **AFFIRM** the district court's grant of summary judgment to the Commissioner.

I.

On August 1, 2007, Peterson, a resident of Eubank, Kentucky, filed an application for SSI, claiming that he became disabled on June 4, 2004. In his disability report, Peterson claimed that he was disabled because of "nerves," blindness in his left eye, and lower-back problems. The Social Security Administration denied Peterson's claim both initially and on reconsideration. ALJ William Newkirk then held a hearing regarding Peterson's disability status before issuing a decision denying Peterson's claim on July 10, 2009. Peterson did not claim any form of intellectual impairment either in his disability report or in his hearing before ALJ Newkirk. On Peterson's request for review, the Appeals Council vacated ALJ Newkirk's decision and remanded his case.

On remand, a new ALJ, William Zuber, held a hearing on May 17, 2010, and issued a new decision on September 9, 2010, again denying Peterson's claim. On May 31, 2012, the Appeals Council denied Peterson's request for review, thereby making ALJ Zuber's decision the final decision of the Commissioner. Peterson then sought judicial review of the Commissioner's final decision under 42 U.S.C. § 405(g). After both Peterson and the Commissioner moved for summary judgment, the district court referred the matter to a magistrate judge, who issued a Report and Recommendation ("R&R") on February 5, 2013. The R&R recommended affirming the Commissioner's final decision. Over Peterson's objections, the district court adopted the R&R and affirmed the Commissioner's decision. This appeal ensued. Because Peterson's appeal only challenges the ALJ's finding regarding Listing 12.05C, the intellectual ability listing, our review of the relevant facts focuses on this area.

A.

Peterson was forty-eight years old when ALJ Zuber issued his September 2010 decision. He has a seventh-grade education and previously worked as a construction laborer. During his hearing and in his work report, Peterson claimed to be unable to read or write. In his disability report, however, he indicated that he could read and understand English and that he could write more than his name; similarly, his school records reflect that in 1978, when he was sixteen, Peterson could read at a fifth-grade level. These same records from 1978 indicate that Peterson could perform mathematics at an eighth-grade level and estimate his IQ to be 80. Over the course of his education, Peterson was held back three times and was enrolled in at least one "SLD"—Specific Learning Disability—reading class.

In March 2004, three months before Peterson alleges his disability began and three years before Peterson filed his SSI claim, a licensed clinical psychologist, Christopher Catt, Psy.D., examined him. Dr. Catt administered an IQ test, which placed Peterson's verbal IQ at 71, performance IQ at 67, and full scale IQ at 66. Dr. Catt believed that this assessment validly represented Peterson's IQ at the time of assessment. Peterson told Dr. Catt that he started consuming alcohol at age twelve and drank regularly. Peterson also stated that he periodically smoked marijuana. Peterson explained that he had a long history with the law: he had been jailed "a couple of hundred times" and estimated that he had collectively spent four to five years in state or county jails. Peterson told Dr. Catt that he washed dishes and did laundry, that he could manage his bills and make change, and that he shopped independently once a month. Dr. Catt diagnosed Peterson with alcohol dependence, marijuana abuse, panic disorder with

agoraphobia, depressive disorder not otherwise specified, and borderline intellectual functioning ("BIF"). In his opinion, Peterson could both understand and maintain attention and concentration on simple, repetitive tasks, but Peterson had a limited ability to tolerate the stresses and pressures of daily employment or to interact appropriately with co-workers.

In September 2007, a certified clinical psychologist, Julie Joseph-Fox, M.A., performed a consultative examination. Joseph-Fox also administered an IQ test to Peterson; she reported that he was a "variably cooperative informant" and that although he was not obviously distracted, his "effort appeared task dependent." This testing, which Joseph-Fox stated as "likely a conservative estimate" of Peterson's abilities, yielded a verbal IQ of 69, a performance IQ of 76, and a full scale IQ of 70. Peterson explained to Joseph-Fox that he drank six to eight beers daily but had been abstinent for the nine months he had recently spent in jail. Peterson denied abusing alcohol but stated that he "couldn't tell [her] how many times" he had been arrested for driving under the influence. Peterson explained that he helped his roommate cook and clean, mowed the lawn, and did his own laundry, but that his roommate did most of the shopping. Joseph-Fox diagnosed Peterson with alcohol abuse and "at least" BIF. She determined that Peterson indicated the ability to understand, remember, and follow instructions, that he had adequate concentration, and that he did not report any reason why persistence or pace would be problematic.

Also in September 2007, Ed Ross, Ph.D., a state agency psychological consultant, reviewed Peterson's record and found that Peterson had both an organic mental disorder, which manifested as BIF to low-average intelligence, and a substance-addiction disorder manifesting as

alcoholism.  Dr. Ross did not diagnose Peterson with mild mental retardation ("MMR")[1] or any related conditions.  Dr. Ross opined that Peterson could understand and recall simple non-detailed work procedures and instructions, could complete routine mental aspects of making work-related decisions, could follow a regular schedule, could tolerate co-workers and accept supervision in an object-focused context, could adapt to gradual change, and could appreciate work hazards.  Dr. Ross's findings were confirmed by two other state agency psychological consultants—Laura Cutler, Ph.D., in January 2008 and Jane Brake, Ph.D., in December 2009.

In October 2009, Gary Maryman, Psy.D., a licensed clinical psychologist, performed another consultative evaluation of Peterson.  Peterson disclosed that he had nine DUI arrests, that he had been imprisoned for his fourth DUI offense, and that he had been arrested roughly twenty times for alcohol intoxication.  Peterson admitted that he had a history of abusing alcohol but said that now he only drank when he "hurt bad."  Upon further probing, Peterson admitted that he hurt bad "about every day" but then claimed that he only drank on weekends.  Peterson stated that his driver's license was suspended but that he would occasionally mow the lawn using a riding mower in exchange for a place to live.  He explained that a neighbor usually did his laundry, prepared his meals, and sometimes did his grocery shopping.  Dr. Maryman diagnosed Peterson with alcohol abuse and antisocial personality traits.  In Dr. Maryman's opinion, Peterson's prognosis was "fair to good," as he could understand, retain, and carry out simple to somewhat complicated instructions and tasks, could follow a routine work schedule, could interact appropriately with co-workers, and could adjust and adapt reasonably well.  Maryman cautioned, however, that Peterson should be in a medium-to-lower-stress work environment and that he was not a good candidate for dealing with the general public.

---

[1] The phrase "intellectual disability" has replaced "mental retardation" in Listing 12.05.  78 Fed. Reg. 46,499 (August 1, 2013) (to be codified at 20 C.F.R. pts. 404 and 416).  Since the vast majority of the record uses the old term, "mental retardation," we do so as well.

B.

In his May 17, 2010 hearing before ALJ Zuber, Peterson testified that he had a seventh grade education, that he had been enrolled in both regular and special education classes, and that he could do math but was unable to read or write. Peterson testified that he cooked his own meals and did his own housework, although he "[did not] know much about housework" and did not use a broom or mop. He explained that someone else did his shopping for him but that he would occasionally buy a soft drink from a local store where his sister-in-law worked. Peterson testified that he no longer drove because he had lost his license and his vision was poor but that he still used a riding lawnmower. *Id.*

During this same hearing, ALJ Zuber presented the attending vocational expert ("VE") with a hypothetical:

> I'd like you to assume a hypothetical individual with the same age, education and work history as the Claimant. This individual would be capable of simple unskilled routine tasks at the light exertional level with an option to sit or stand every 30 to 45 minutes. This individual would be capable of occasional climbing of ramps and stairs, occasional stooping, crouching, crawling, and kneeling. No climbing of ladders, ropes or scaffolds. No use of the left lower extremity for foot controls. This individual would be limited to tasks that wouldn't require more than monocular vision on the right side. No more than occasional interaction with coworkers and supervisors. No contact with the general public. No exposure to unprotected heights or dangerous machinery. No tasks require any reading or writing.

The VE stated that a claimant with those limitations could work as an inspector, tester, or sorter and that there were 2,000 such jobs in Kentucky and 97,000 in the U.S. economy. If the hypothetical were modified so that the exertion level was reduced to sedentary, the VE testified that there would be 200 inspector-tester-sorter jobs in Kentucky and 10,000 nationally. The VE further testified that this modified hypothetical claimant could work as a hand laborer, a position with 820 jobs in Kentucky and 56,000 nationally. The VE did testify, however, that if the

hypothetical were further modified to reduce the sit-stand option to fifteen to twenty minutes at a time, then there would not be work for such a claimant.

C.

In his evaluation of Peterson's application, ALJ Zuber first found that Peterson had not engaged in substantial gainful activity since he had applied for SSI on July 20, 2007. ALJ Zuber then found that Peterson had the severe impairments of BIF, alcohol dependence, antisocial personality traits, left-eye blindness, lumbar degenerative disc disease, and hypertension, but that none of these—either alone or in combination—met or medically equaled any of the listed impairments. In making this determination, ALJ Zuber specifically discussed the IQ test that Joseph-Fox administered, emphasizing the questionable reliability of its results because of Peterson's variable effort, and further noted that the record failed to demonstrate that Peterson's IQ was in the range of 60 to 70 before age twenty-two. ALJ Zuber found Peterson's functional adaptability to be only mildly limited. Based on these findings, ALJ Zuber concluded that Peterson did not meet the Listing 12.05 criteria.

ALJ Zuber then concluded that Peterson had the physical residual functional capacity ("RFC") to perform a range of light work that allowed for a sit-stand option, that Peterson could stoop, crouch, kneel, and climb ramps or stairs on occasion. ALJ Zuber stated that Peterson could never climb ladders, ropes, or scaffolds or operate foot controls with his lower left extremity and that Peterson should avoid unprotected heights and dangerous machinery. He further determined that Peterson was limited to jobs that permitted right monocular vision and did not require reading or writing. ALJ Zuber found that Peterson was limited to simple, routine,

unskilled work that required only occasional interaction with coworkers or supervisors and did not require interaction with the general public. With these limitations, ALJ Zuber determined that Peterson could not perform his past relevant work. Relying on VE testimony and looking to Medical-Vocational Guideline Rule 202.18, ALJ Zuber found that there were a significant number of jobs in the national economy that a hypothetical person whose age, education, past work history, and RFC mirrored Peterson's could perform. ALJ Zuber therefore concluded that Peterson was not disabled.

## II.

In reviewing an ALJ's decision in a social security case, the only issues before us are whether the ALJ applied the correct legal standards and whether substantial evidence supports the decision. *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009); *see also* 42 U.S.C. § 405(g). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001) (quoting *Richardson*, 402 U.S. at 401).

"The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts." *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)). The Commissioner's findings are not reversible merely because substantial evidence in the record could support a different conclusion. *Id.* Rather, even if such contrary substantial evidence exists, we affirm the ALJ's decision so long as there is evidence reasonably supporting the ALJ's conclusion. *Id.* (citing *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). We may look to portions of the record that the ALJ did not discuss or cite, *see Walker v. Sec'y of Health & Human Servs.*, 884

F.2d 241, 245 (6th Cir. 1989), but we "do not try the case de novo, resolve conflicts in evidence, or decide questions of credibility," *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007).

To qualify for benefits, Peterson must establish that he is disabled within the meaning of the Social Security Act. 42 U.S.C. § 423(a)(1). The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A).

The Act creates a five-step process for assessing a disability claim. *See, e.g.*, *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). First, a claimant must demonstrate that he is not engaged in any "substantial gainful activity." *Vance v. Comm'r of Soc. Sec.*, 260 F. App'x 801, 803 (6th Cir. 2008) (citing 20 C.F.R. §§ 404.1520(b), 416.920(b)). If a claimant is not engaged in any substantial gainful activity, he must demonstrate that he suffers from a severe impairment, one which "significantly limits . . . physical or mental ability to do basic work activities." *Id.* at 803–804 (citing 20 C.F.R. §§ 404.1520(c), 416.920(c)). In the third step, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and that impairment meets or equals a listed impairment located at 20 C.F.R. Pt. 404, Subpt. P, App'x 1, then the claimant is presumed disabled. *Id.* at 804 (citing 20 C.F.R. §§ 404.1520(d), 416.920(d)). In the fourth step, the claimant is not disabled if his impairments do not prevent him from doing his past relevant work. Finally, even if the claimant cannot perform his past relevant work, he is not disabled if he can perform other work that exists in the national economy. *Id.* (citing *Abbot v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)).

III.

Peterson contends that the ALJ should have found that he was disabled in the third step of the sequential evaluation. He argues that he satisfied the requirements listed in 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.05C because he had a listings-level IQ score, and the ALJ had already found that he had a number of severe physical or other mental impairments. *Id*. Accordingly, he contends that there is not substantial evidence to support the ALJ's decision. Peterson must satisfy his burden of proving his disability by showing that his impairments meet or equal a listed impairment. *See* 20 C.F.R. § 416.920(a)(4)(iii); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

Because satisfying the listings during the third step yields an automatic determination of disability based on medical findings, rather than a judgment based on all relevant factors for an individual claimant, the evidentiary standards for a presumptive disability under the listings are more strenuous than for claims that proceed through the entire five-step evaluation. *See* 20 C.F.R. §§ 416.925(d), 416.926; *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990). To demonstrate that his impairment meets or equals any mental listing, including any subsection of Listing 12.05, Peterson must demonstrate he satisfies the diagnostic description for the particular listed impairment. *See* 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.00. Peterson satisfies Listing 12.05 only if his impairment "satisfies the diagnostic description in the introductory paragraph and any one of the four sets of criteria . . . ." 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.00A. An impairment that satisfies only some of the relevant listing criteria does not qualify, regardless of its severity. *See Zebley*, 493 U.S. at 530. To show that his impairment meets subsection C of Listing 12.05, for "mental retardation," Peterson must show that he had: (1) significantly sub-average general intellectual functioning with deficits in adaptive functioning prior to age twenty-two; (2) a valid verbal, performance, or full scale IQ of 60 to 70; and (3) another physical or

mental impairment imposing an additional and significant work-related limitation of function. 20 C.F.R. Pt. 404, Subpt. P, App'x 1, §§ 12.00A, 12.05C; *Zebley*, 493 U.S. at 530–32; *Foster*, 279 F.3d at 354–55. Substantial evidence in the records exists to support ALJ Zuber's conclusion that Peterson has failed to do so, although there is likewise sufficient evidence to support that Peterson met the requirement with a full scale IQ score of 70 on one exam.

The record does not reflect that Peterson has ever been diagnosed with MMR. Although an MMR diagnosis is not a necessary prerequisite to satisfy Listing 12.05, its absence is probative for a 12.05C determination. *See Cooper v. Comm'r of Soc. Sec.*, 217 F. App'x 450, 452 (6th Cir. 2007). Dr. Catt and Dr. Maryman—the two psychologists who examined Peterson—stated that Peterson had BIF rather than MMR. Similarly, Dr. Cutler and Dr. Ross, two of the state agency consultants, likewise determined that Peterson had BIF to low-average intelligence. Because the evidence in the record fails to indicate that Peterson satisfied the diagnostic description of MMR, *see* 20 C.F.R. Pt. 404, Subpt. P, App'x 1 §§ 12.00A, 12.05, ALJ Zuber's finding that Peterson did not meet the Listing 12.05 criteria is supported by substantial evidence.

In an attempt to establish that the ALJ erred by failing to determine that his IQ was within 12.05C's range of 60-70, Peterson contends that ALJ Zuber explicitly should have discussed the results of the 2004 IQ test administered by Dr. Catt, particularly given ALJ Zuber's concerns about the reliability of Joseph-Fox's 2007 IQ test result. But because Dr. Catt was an examining psychologist—not a treating doctor—his opinion is not entitled to any special deference. *See* 20 C.F.R. § 416.927(c)(2). As Peterson correctly notes, ALJ Zuber did not specifically discuss Dr. Catt's IQ test. ALJ Zuber did, however, concur with the findings of the state agency consultants, Dr. Ross and Dr. Cutler, both of whom considered Dr. Catt's evaluation

in making their findings. As such, ALJ Zuber's failure to address the 2004 IQ test results explicitly in his findings does not indicate that he disregarded these results or that his decision was not supported by substantial evidence.

Peterson also struggles to meet Listing 12.05's diagnostic description because the record lacks evidence indicating that he had adaptive functioning deficits before he was twenty-two. As Peterson correctly argues, adaptive functioning is different from intellectual functioning, and Peterson does not need to produce IQ scores from his childhood in order to meet this requirement. *See West v. Comm'r of Soc. Sec.*, 240 F. App'x 692, 698 (6th Cir. 2007); *McPeek v. Sec'y of Health & Human Servs.*, 19 F.3d 19, at *2 (6th Cir. 1994) (unpublished table decision). Nonetheless, Peterson must put on evidence indicating that he had adaptive functioning deficits during his developmental period. In an attempt to do so, Peterson points to his poor academic history, noting that he attended SLD classes, that he was illiterate, and that he dropped out of school in the seventh grade.

Peterson's school records, however, are a double-edged sword. The same records on which Peterson relies also indicate that when he dropped out of school, he could read at a fifth-grade level, could handle eighth-grade level math, and had an IQ of 80. Moreover, neither circumstantial evidence such as school records nor a history of special education combined with an adult IQ score are necessarily enough to demonstrate that a claimant had adaptive functioning deficits before age twenty-two. *See, e.g.*, *Eddy v. Comm'r of Soc. Sec.*, 506 F. App'x 508, 510 (6th Cir. 2012) (holding that a claimant's eighth grade education with a history of special education classes did not establish deficits in adaptive functioning prior to age twenty-two); *Foster*, 279 F.3d at 352–55 (finding that a ninth-grade education completed through special education classes, followed by numerous unsuccessful attempts at a GED, coupled with an adult

full scale IQ of 69 did not establish adaptive functioning deficits prior to age twenty-two); *cf.*

*Hayes v. Comm'r of Soc. Sec.*, 357 F. App'x. 672, 676–77 (6th Cir. 2009) ("This Court has never

held that poor academic performance, in and of itself, is sufficient to warrant a finding of onset

of subaverage intellectual functioning before age twenty-two.").

Peterson's claim also is hamstrung by his robustly documented history with alcohol. His

declining IQ and backslide in skills such as reading, coupled with his having been diagnosed

with alcohol dependency or abuse by every relevant professional who evaluated him, suggests

that Peterson's loss of adaptive functioning occurred after the developmental phase. *See Brown

v. Sec'y of Health & Human Servs.*, 948 F.2d 268, 271 (6th Cir. 1991) (remanding a Listing

12.05C case to determine whether the claimant's adult IQ scores were a product of his alcohol

dependence). This suggestion is bolstered by Dr. Ross's and Dr. Cutler's each determining,

based on their respective reviews of Peterson's records, that Peterson had BIF arising from an

organic mental disorder.

IV.

Peterson undeniably has pointed to pieces of evidence in the record that indicate that he

might be disabled as defined under 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.05C. Merely

marshalling evidence to suggest that he is disabled, however, is insufficient; to prevail on appeal,

Peterson must demonstrate that the ALJ's determination that he was not disabled is not supported

by substantial evidence. He has failed to do so. Because substantial evidence in the record

supports ALJ Zuber's determination that Peterson is not disabled, we **AFFIRM** the district

court's grant of summary judgment to the Commissioner.